**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(Baltimore Division)**

KIRAN KUMAR NALLAGONDA, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

OSIRIS THERAPEUTICS, INC., LODE DEBRABANDERE, GREGORY I. LAW, and PHILIP R. JACOBY, JR.,

Defendants.

C.A. No. 1:15-cv-03562-PX

**CLASS ACTION**

**JURY TRIAL DEMANDED**

**AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 4

III. PARTIES ..... 5

IV. CLASS ACTION ALLEGATIONS ..... 9

V. BACKGROUND: DEFENDANTS' FRAUDULENT SCHEME ..... 10

A. Osiris's Success Depended on Its Core Operation: Biosurgery Business. ..... 11

B. Osiris Is Required and Failed to Follow GAAP Revenue Recognition Rules ..... 13

C. Osiris is Required and Failed to Have Proper Internal Controls and SOX Certifications ..... 17

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS OR OMISSIONS OF MATERIAL FACTS DURING THE CLASS PERIOD ..... 20

A. Defendants' False and Misleading Statements ..... 20

1. First Quarter 2014 (Ending March 31, 2014) ..... 20

2. Second Quarter 2014 (Ending June 30, 2014) ..... 24

3. Third Quarter 2014 (Ending September 30, 2014) ..... 28

4. Fourth Quarter and Full Year 2014 (Ending December 31, 2014) ..... 32

5. First Quarter 2015 (Ending March 31, 2015) ..... 37

6. Second Quarter 2015 (Ending June 30, 2015) ..... 41

7. Third Quarter 2015 (Ending September 30, 2015) ..... 45

B. Defendants' False and Misleading Statements During the Class Period Were Intended to Conceal Improper Conduct in Reporting Revenues from Transactions with Specific Distributors ..... 49

1. Distributor A ..... 49

a. Fraudulent and Improper Recognition of Revenue in the Fourth Quarter 2014 Related to Distributor A ..... 50

b. The Fraudulent and Improper Recognition of Revenue in the First Quarter of 2015 Related to Distributor A ..... 52

c. Additional Deceptive Conduct In Furtherance Of Their Scheme Regarding Distributor A, Including Deceit of Auditors ................52

d. Osiris Overstated the Distributor A Transactions ..........................55

2. Distributor B ..........................................................................................55

a. The Fraudulent and Improper Recognition of Revenue in the First Quarter of 2015 Related to Distributor B .....................................56

b. Additional Deceptive Conduct In Furtherance of Their Scheme Regarding Distributor B, Including Deceit of Auditors.................58

(1) First and Second Quarters of 2015....................................58

(2) Third and Fourth Quarters 2015 .......................................59

3. Distributor C ..........................................................................................61

a. Defendants Used the Wrong Pricing to Fraudulently and Improperly Recognize False Revenues from Distributor C in the First, Second, and Third Quarters of 2015....................................62

b. Defendants' Fraudulently and Improperly Recognized Revenue on Consigned Product in the First, Second, and Third Quarters of 2015 Related to Distributor C ......................................................65

c. Jacoby's and Law's Additional Misstatements in Furtherance Of Their Scheme Regarding Distributor C ........................................67

d. Additional Deceptive Conduct In Furtherance of their Scheme Regarding Distributor C, Including Deceit of Auditors.................68

4. Distributor D ..........................................................................................69

a. The Fraudulent and Improper Recognition of Revenue Throughout 2014 and the First Three Quarters of 2015 Related to Distributor D70

b. Osiris's Restatement of the 2014 Revenue Associated with Distributor D. ...................................................................................72

c. Other Deceptive Conduct in Furtherance of their Scheme Regarding Distributor D, Including Deceit of Auditors ................72

C. Defendants' Misstatements Were Material...........................................................74

D. The Truth Emerges ..............................................................................................75

E. Post-Class Period Disclosures Reveal the Accounting Fraud...............................79

F. Restatement of the Company's 2014 Results ....................85

VII. LOSS CAUSATION ....................91

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ....................93

IX. NO SAFE HARBOR ....................94

COUNT I ....................94

COUNT II ....................95

X. PRAYER FOR RELIEF ....................96

XI. JURY TRIAL DEMANDED ....................97

Lead Plaintiff Dr. Raffy Mirzayan ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants Osiris Therapeutics, Inc. ("Osiris" or the "Company"), Philip R. Jacoby, Jr. ("Jacoby"), Gregory I. Law ("Law"), and Lode B. Debrabandere ("Debrabandere") (collectively, "Defendants"), alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public statements, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by -and regarding-Osiris, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Osiris securities ("Class") between May 12, 2014 and November 16, 2015, both dates inclusive (the "Class Period"). Lead Plaintiff seeks to recover damages caused by Defendants' violations of Sections 10(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. The Defendants' conduct was driven by a tone at the top that was established and communicated by Debrabandere, and embraced and facilitated by Jacoby and Law. During 2014 and the first three quarters of 2015, Osiris was fixated on recognizing *gross* revenue, which Osiris executives and employees often referred to as "top line" revenue. In particular, Osiris was

focused on demonstrating consistent revenue growth each quarter –even if the revenues were false.

3. When the Defendants realized that Osiris's actual sales were not meeting Debrabandere's aggressive targets, they engaged in a variety of improper accounting practices artificially inflating reported revenue.

4. During the Class Period, Defendants repeatedly engaged in wide-ranging fraudulent acts that artificially inflated the Company's reported revenues and misled Osiris's shareholders and the public as to Osiris's revenue and revenue growth. For example, Osiris unlawfully: (i) prematurely recognized revenue in periods before sales had been made and before critical agreement terms were finalized; (ii) recognized revenue using higher, inaccurate prices, while deliberately disregarding data that explicitly attested to lower, actual revenue numbers; and (iii) recognized revenue on consignment inventory, directly contradicting Osiris's disclosed accounting policies. These actions led to, or themselves constituted, misstatements about Osiris's revenue, a key financial metric for the company, which was published in Osiris's SEC filings, reports, and earnings calls.

5. The Defendants' scheme included improperly and fraudulently initiating extra-contractual terms at the onset of Osiris's arrangements with product distributors, fraudulently initiating and agreeing to unusually long payment terms after negotiating and documenting the agreement with product distributors, and in at least one instance fraudulently creating deal documents after the close of Osiris's 2014 fiscal year and after filing the 2014 annual with the SEC. The false deal documents fabricated an arrangement with a distributor that did not exist at the time the revenues were recognized and resulted in materially inflated revenues during the fourth quarter ended December 31, 2014.

6. Moreover, the Defendants repeatedly, falsely and misleadingly assured investors of the integrity of Osiris's financial reports filed with the SEC. Those reports include the reports filed on Form 10-Q for the periods ended March 31, 2014, June 30, 2014, and September 30, 2014, the Form 10-K for the quarter and year ended December 31, 2014, and on Form 10-Q for the periods ended March 31, 2015, June 30, 2015, and September 30, 2015 (collectively, "Non-Reliance Period reports"). Each report was false and misleading and/or they omitted information necessary to make their statements not false and misleading.

7. In truth, throughout the Class Period, Defendants knowingly reported materially false and misleading financial information and/or failed to disclose information known to them that was necessary to reasonable investors to make Defendants' reports not false and misleading.

8. On November 16, 2015 Defendants filed Osiris's quarterly report on Form 10-Q for the period ended September 30, 2015, announcing adjustments to the Company's financial reports. Defendants included incomplete adjustments to correct a small subset of their known improper and materially inaccurate accounting entries to Osiris's financial reports. Unknown to Osiris investors, Defendants' adjustments were just the tip of the iceberg. Nonetheless, Defendants' November 16, 2015 partial but materially inaccurate disclosures were sufficient to cause a steep price decline of Osiris shares which plunged approximately 21.5% to close at $10.97 on November 17, 2015. Four days later, Defendants announced that they would restate their revenues for all of 2014 and the first three quarters of 2015.

9. On top of the severe damage Defendants inflicted on Osiris investors, Defendants subjected the Company to an SEC investigation of Osiris's historical accounting practices and a criminal investigation by the United States Attorney for the Southern District of New York. On or around November 2, 2017, Jacoby pleaded guilty to criminal charges for his role in the

allegations set forth in this Complaint, in particular, making false statements to auditors to inflate the company's reported revenue.

10. The full impact of Defendants' accounting fraud is not yet known because, although Defendants informed investors that Osiris's 2015 quarterly financial reports cannot be relied upon and must be restated because of material in accuracies, Defendants have not yet filed those documents or the required 2015 annual report, 2016 quarterly reports, 2016 annual report, or the 2017 quarterly reports with the SEC.

11. Because of Defendants' fraudulent conduct, Osiris has been unable to comply with NASDAQ listing rules requiring filings of annual and interim financial reports. Shares of Osiris common stock were delisted effective on or about March 24, 2017 and currently trades on the OTC market. Since 2016, Osiris's Chairman, has announced the departure and hiring of five new CEO's at Osiris.

## II. JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

14. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Osiris is headquartered in this District and many of the acts pled herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

15. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

16. Lead Plaintiff, Dr. Mirzayan, purchased shares of Osiris during the Class Period and was harmed by of Defendants' wrongful conduct. The Court appointed him as Lead Plaintiff on March 21, 2016.

17. Defendant Osiris Therapeutics, Inc. ("Osiris") is a Maryland corporation with its principal executive offices located at 7015 Albert Einstein Drive, Columbia, Maryland. During the Class Period, Osiris common stock traded on the NASDAQ under the ticker symbol "OSIR." After delisting for failure to file timely financial reports, Osiris began trading on the OTC Market. Osiris has a single core operation – its Biosurgery business – which the Company states works to harness the ability of cells and novel constructs to promote the body's natural healing with the goals of improving surgical outcomes and offering better treatment options for patients and physicians. Osiris's main products include Grafix®, Cartiform®, and Ovation®. On September 19, 2013, Osiris's Audit Committee terminated the Company's then-outside-auditor (Grant Thornton LLP) and engaged BDO USA, LLP as outside auditor for the year ended December 31, 2014. BDO USA, LLP is referred to herein as "Auditor" and "BDO."

18. Defendant Lode Debrabandere, Ph.D. ("Debrabandere") became the President and Chief Executive Officer of Osiris on January 13, 2014. He served in those capacities until he was effectively fired on or about February 3, 2016. Osiris's April 30, 2015 Form DEF-14A, documented that the Compensation Committee of Osiris's Board of Directors 2014 objective was to align executive compensation with a desire to accelerate the commercial success of Osiris's core Biosurgery business. Debrabandere's annual bonus structure for 2014 reflected this

objective and the Compensation Committee evaluated his contributions to this objective in setting his compensation. Debrabandere signed sworn Sarbanes Oxley ("SOX") certifications for all of the Non-Reliance Period financial reports. His total 2014 compensation, including a March 2015 $150,000 bonus, was $1,705,000 – more than a threefold increase over his 2013 compensation. In 2015, his base salary was increased 10% to $396,000.

19. Defendant Philip R. Jacoby, Jr. ("Jacoby") was, during the Class Period, Osiris's Chief Financial Officer. For part of the Class Period, beginning on or about September 30, 2014 through late November 2014, Jacoby also served as Osiris's Controller and Chief Accounting Officer. On September 17, 2015, Osiris announced that Jacoby and Law would switch roles. Jacoby assumed the CAO function and Gregory I. Law took over as CFO. Osiris provided no explanation for this switch in its press release. Jacoby signed SOX certifications for all but the last Non-Reliance Period report. Jacoby, like Debrabandere was eligible for an annual bonus dependent on his contribution to the success of the core Biosurgery business. During the Class Period and while in possession of non-public information concerning Osiris accounting irregularities, Jacoby sold Osiris shares for total proceeds of nearly $1 million.

20. Defendant Gregory Law ("Law") was, during the Class Period, Osiris's Vice President of Finance and Principal Accounting Officer until he abruptly replaced Jacoby as Chief Financial Officer ("CFO"). Before his role as a senior officer of Osiris, Law was a consultant for the Company in a variety of areas including Sarbanes Oxley compliance, internal audit and as interim Controller following the former Controller's abrupt resignation on September 30, 2014. When Law was hired as CFO on November 17, 2014, he became eligible to receive an annual bonus consistent with the Compensation Committee objective. He also received options to purchase 20,000 shares of Osiris stock, vesting on an equal basis annually over four years and

with an exercise price of $13.05 per share. Law submitted a SOX certification with the last Non-Reliance Period financial report.

21. During the Class Period, Debrabandere, Jacoby, and Law (the "Individual Defendants"), as senior executive officers and/or directors of Osiris, were privy to confidential and proprietary information concerning Osiris, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Osiris, as discussed in detail below. Because of their positions with Osiris, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

22. The Individual Defendants are liable as direct participants in the violations of federal securities laws and regulations complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Osiris's business.

23. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

24. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose securities were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Osiris's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Osiris's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Osiris's securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investors regarding Osiris's business, operations and management and the intrinsic value of Osiris's securities and caused Lead Plaintiff and members of the Class to purchase Osiris common stock at artificially inflated prices.

## IV. CLASS ACTION ALLEGATIONS

26. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who, between May 12, 2014, and November 16, 2015, inclusive (the "Class Period"), suffered losses as a result of their purchase of shares of Osiris common stock (the "Class"). Excluded from the Class are any judicial officer hearing this case, Defendants, the officers and directors of Osiris, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

27. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Osiris common stock was actively traded on the NASDAQ Stock Market. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Osiris or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

29. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

30. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Osiris or omitted information necessary to make the statements true;

c. whether the price of Osiris stock was artificially inflated during the Class Period; and

d. to what extent the members of the Class have sustained damages and the proper measure of damages.

31. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V. BACKGROUND: DEFENDANTS' FRAUDULENT SCHEME

32. As a result of the fraudulent financial misstatements and or omissions detailed in this Amended Complaint, Defendants scheme caused Osiris to cumulatively overstate its revenue by approximately 17 percent for the four quarters of 2014, and cumulatively overstated its revenue by approximately 9 percent for the first three quarters of 2015. The fraud perpetrated by the Defendants falsely created the illusion that Osiris consistently met or exceeded analyst consensus estimates for revenue during 2014 and the first three quarters of 2015.

**A. Osiris's Success Depended on Its Core Operation: Biosurgery Business.**

33. During the Class Period, Osiris's Biosurgery operation focused on the development, manufacture and distribution of biologic products for wound healing, cartilage repair, and orthopedics to harness the ability of cells and novel constructs to promote the body's natural healing.

34. Osiris's relevant Biosurgery products include Grafix®, a wound care product; Cartiform®, an allograft used for cartilage repair; Ovation, a wound and soft tissue repair product; and OvationOS™, which was rebranded as BIO4TM®, a bone matrix that is used for bone repair and regeneration ("BIO4"). The Company launched Grafix® for commercial distribution in 2010, began distribution of Ovation® in early 2011, and began distribution of Cartiform® during 2013.

35. On about September 26, 2013, the U.S. Food and Drug Administration sent an untitled letter to Osiris's then CEO –C. Randall Mills –informing him that Osiris was marketing its Biosurgery products in violation of Federal law.

36. On October 21, 2013, Osiris announced it reached agreement with the FDA regarding the regulatory pathway for Grafix® and Ovation®: "After discussions with the FDA, the regulatory status of Grafix is confirmed and the product will remain on the market as a wound cover for the treatment of acute and chronic wounds. For certain expanded indications for Grafix, Osiris has committed to submit a Biologics License Application (BLA)…. Additionally, Osiris will continue transitioning its Ovation product line over to the company's

newly launched OvationOS™ formulation and has agreed to complete this transition no later than the second half of 2014."[1]

37. In the second half of 2014 Osiris began commercial sale of OvationOS® (rebranded by Stryker as BIO™ in 2015), a cadaveric bone product used in many of the same clinical applications historically served by the Company's placenta-based Ovation® product. The Company's sales force focused exclusively on Grafix® sales. Osiris entered into two exclusive distribution agreements in the fourth quarter of 2014, with a subsidiary of Stryker for the marketing and distribution of BIO™ (formerly branded OvationOS®), and with Arthrex for the marketing and distribution of Cartiform®.

38. During the Class Period, Osiris sold its Biosurgery products to end-users through its in-house sales force, sales agents, and third-party distributors.

39. In addition to selling products, Osiris would also consign product to distributors and to end-user customers. In relevant SEC filings, Osiris stated that revenue was not recognized upon the placement of inventory into consignment. Instead, Osiris stated that for consigned product, it recognized revenue when it received appropriate notification that the product had been used in a surgical procedure.

40. Osiris's May 12, 2014 Form 10-Q confirmed that Biosurgery was now the Company's core operation:

> *We now operate only our Biosurgery business*, as a result of the sale of our Therapeutics segment assets in the fourth quarter of 2013, as discussed further below. Our Biosurgery business focuses on products for wound care, cartilage repair, and orthopedics, to harness the ability of cells and novel constructs to promote the body's natural healing….

---

[1] Osiris Therapeutics, Inc. 10/21/13 Form 8-K, Ex. 99.1 (available at https://www.sec.gov/Archives/edgar/data/1360886/000110465913076521/a13-22547_1ex99d1.htm ) (accessed 3/23/17).

> Our Biosurgery business has continued to grow since its inception, and we have increased our organizational focus on the development and commercialization of products in this segment. Consistent with this organizational focus…we entered into a Purchase Agreement to sell our Therapeutics segment…. Our continuing operations now represent the portion of our business previously referred to as our Biosurgery segment.[2]

41. In the Company's March 17, 2015, Form NT 10-K, Defendants explained, "[t]he Company shifted its focus to its Biosurgery business in fiscal 2014, and product revenue increased 146% in fiscal 2014 as compared to 2013."[3] The filing was signed by Defendant Jacoby as Osiris's CFO.

**B. Osiris Is Required and Failed to Follow GAAP Revenue Recognition Rules**

42. As a public company, Osiris was required to file quarterly and annual reports with the SEC that presented its financial results in conformity with Generally Accepted Accounting Principles ("GAAP").

43. GAAP permits Osiris to recognize revenue in connection with sales of its products only when revenue is realized, realizable, or earned. Accounting guidance provides that this occurs when: (i) title and the risk of loss passes to the customer; (ii) persuasive evidence of an arrangement exists; (iii) sales amounts are fixed or determinable; and (iv) collectability is reasonably assured.

44. GAAP is the set of conventions, rules and procedures which constitute the professional standards of the accounting profession. Regulation S-X (17 C.F.R. § 210.4-

---

[2] Osiris Form 10-Q for the quarterly period ended March 31, 2014 (filed May 12, 2014), p7, available at https://www.sec.gov/Archives/edgar/data/1360886/000110465914037626/a14-9603_110q.htm#NotesToUnauditedCondensedFinancia_172835 (accessed 12/20/16).

[3] Osiris March 17, 2015 Form NT 10-K (available at https://www.sec.gov/Archives/edgar/data/1360886/000110465915020443/a14-26233_4nt10k.htm ) (accessed 9/7/17).

01(a)(1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading or inaccurate.

45. Osiris's Non-Reliance Period reports were presented in a manner that violated GAAP, including the following principles:

a. The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (Accounting Principles Board Opinion No. 28, ¶10);

b. The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

c. The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

d. The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

e. The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

f. The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

g. The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

h. The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

46. The Financial Accounting Standards Board ("FASB") *Statement of Financial Accounting Concepts No. 5*[4] sets forth fundamental revenue recognition criteria:

> 83. Further guidance for recognition of revenues and gains is intended to provide an acceptable level of assurance of the existence and amounts of revenues and gains before they are recognized. Revenues and gains of an enterprise during a period are generally measured by the exchange values of the assets (goods or services) or liabilities involved, and recognition involves consideration of two factors, (a) being realized or realizable and (b) being earned, with sometimes one and sometimes the other being the more important consideration.
>
> a. **Realized or realizable.** Revenues and gains generally are **not recognized until** realized or realizable. Revenues and gains are realized **when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash.** Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash. Readily convertible assets have (i) interchangeable (fungible) units and (ii) quoted prices available in an active market that can rapidly absorb the quantity held by the entity without significantly affecting the price.
>
> b. **Earned**. Revenues are **not recognized until earned**. An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned **when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues**. Gains commonly result from transactions and other events that involve no "earning process," and for recognizing gains, being earned is generally less significant than being realized or realizable.
>
> (Emphasis added)

47. The SEC codified its interpretation of GAAP's revenue recognition rules in *Staff Accounting Bulletin No. 101* ("SAB 101"). In *SAB 101* the SEC stated "revenue generally is realized or realizable and earned when all of the following criteria are met: [p]ersuasive evidence of an arrangement exists, [d]elivery has occurred or services have been rendered, [t]he seller's price to the buyer is fixed or determinable, and [c]ollectibility is reasonably assured."

---

[4] *Statement of Financial Accounting Concepts No. 5* (available at http://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1218220132773&acceptedDisclaimer=true )

48. The *Accounting Standards Codification 606 ("ASC 606")* and *SAB 101* are relevant to revenue recognition under consignment arrangements. The SEC stated that "[p]roducts delivered to a consignee pursuant to a consignment arrangement are not sales and do not qualify for revenue recognition until a sale occurs."

49. *ASC 606* and *SAB 101* also govern revenue recognition under bill-and-hold arrangements. These arrangements are contracts under which an entity bills a customer for a product but the entity retains physical possession of the product until it is transferred to the customer at a point in time in the future. The SEC has identified criteria that must be met before revenue recognition is proper under bill-and-hold arrangements. These include (a) the risks of ownership must have passed to the buyer; (b) the customer must have made a fixed commitment to purchase the goods, preferably in written documentation; (c) the buyer, not the seller, must request that the transaction be on a bill and hold bases and the buyer must have a substantial business purpose for ordering the goods on a bill and hold basis; (d) there must be a fixed schedule for delivery of the goods that must be reasonable and consistent with the buyer's business purpose; (e) the seller must not have retained any specific performance obligations such that the earnings process is incomplete; and (f) the product must be complete and ready for shipment.

50. *ASC 606* and *SAB 101* also govern revenue recognition when a right of return exists. The SEC has stated that revenue recognition when a right of return exists is precluded when the buyer has the right to return the product and (a) the buyer does not pay the seller at the time of sale, and the buyer is not obligated to pay the seller at a specified date or dates, (b) the buyer does not pay the seller at the time of sale but rather is obligated to pay at a specified date or dates, and the buyer's obligation to pay is contractually or implicitly excused until the buyer

resells the product or subsequently consumes or uses the product, (c) the buyer's obligation to the seller would be changed (*e.g.*, the seller would forgive the obligation or grant a refund) in the event of theft or physical destruction or damage of the product, (d) the buyer acquiring the product for resale does not have economic substance apart from that provided by the seller, or (e) the seller has significant obligations for future performance to directly bring about resale of the product by the buyer.

51. Defendants flouted these basic and other accounting rules throughout the Class Period, particularly with respect to Osiris's arrangements with product distributors.

**C. Osiris is Required and Failed to Have Proper Internal Controls and SOX Certifications**

52. In conjunction with the Defendants' quest to artificially inflate Osiris's revenue thereby creating the false impression of revenue growth, Debrabandere, Law, and Jacoby, failed to implement adequate controls over Osiris's financial reporting, which led to repeated financial misstatements and the failure to detect fraud.

53. Among other things, Osiris did not devise or maintain effective controls over revenue recognition, including a lack of effective controls: (i) to ensure that revenue was not recognized prior to the company obtaining written documentation demonstrating that persuasive evidence of an arrangement existed and the terms were fixed or determinable; (ii) to ensure that adequate analysis and documentation existed for distributor contracts to ensure timely and accurate recording of revenue in accordance with GAAP; (iii) to ensure proper compliance with bill and hold criteria; and (iv) to ensure appropriate accounting for consignment arrangements.

54. As detailed herein, internal controls were also circumvented by the Defendants. For example, Jacoby and an Osiris employee named Bobby Wayne Montgomery ("Montgomery") created and used falsified and backdated documents to support the recognition

of revenue and Debrabandere, Jacoby, and Law participated in, or failed to take action to prevent or disclose, the extra-contractual or undocumented terms of arrangements with distributors.

55. Osiris's lack of internal controls and the fraudulent conduct of the Defendants resulted in Osiris's misstating revenue with respect to numerous of its distributor and sales agent relationships in 2014 and 2015.

56. The following standards related to "internal controls" are relevant to the conduct and claims alleged herein.

57. In 1992, the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") defined internal control as "a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives' in three categories – effectiveness and efficiency in operations; reliability of financial reporting; and compliance with applicable laws and regulations."[5] In 1995, the American Institute of Certified Public Accountants ("AICPA") incorporated COSO's definition of internal controls in Statement on Auditing Standards No. 78 (codified as AU §319).[6]

58. Section 404 of the Sarbanes-Oxley Act of 2002 requires companies subject to the reporting requirements of the Exchange Act, other than registered investment companies, to include in their annual reports management's report on the company's internal control over financial reporting. The internal control report must include: "a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting

[5] *See e.g., SEC Final Rule: Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*, 17 CFR Parts 210, 228, 229, 240, 270 and 274, available at https://www.sec.gov/rules/final/33-8238.htm (accessed 12/9/16).

[6] *Id.*

for the company; management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year; a statement identifying the framework used by management to evaluate the effectiveness of the company's internal control over financial reporting; and a statement that the registered public accounting firm that audited the company's financial statements included in the annual report has issued an attestation report on management's assessment of the company's internal control over financial reporting."[7] The SEC added a requirement "that management evaluate any change in the company's internal control over financial reporting that occurred during a fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting."

59. With respect to interim quarterly disclosures, the SEC requires "a company's management, with the participation of the principal executive and financial officers, to evaluate any change in the company's internal control over financial reporting that occurred during a fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting."[8]

60. During the Class Period, Debrabandere, Jacoby and Law deliberately, falsely and misleadingly certified (and/or omitted information necessary to make their certifications not false and misleading) that:

a. Osiris's financial reports did not contain untrue statements of a material fact or omitted material facts necessary to make statements made not misleading;

b. Osiris's financial reports fairly presented in all material respects Osiris's financial condition, operations and cash flows;

---

[7] *Id.*

[8] *Id.*

c. they disclosed all significant weaknesses in internal controls over financial reporting to the Audit Committee and the outside auditor; and,

d. they disclosed any fraud, whether or not material, that involved management or other employees who had a significant role in Osiris's internal controls over financial reporting.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS OR OMISSIONS OF MATERIAL FACTS DURING THE CLASS PERIOD

61. Throughout the Class Period, Defendants made numerous false and misleading statements and/or omitted disclosing material facts any reasonable investor would deem material to their investment decisions. Defendants engaged in intentional misconduct or were so severely reckless that they knew or it was so obvious to them that they must have known the danger their conduct would mislead Osiris investors. This conclusion follows in part from Defendants' self-proclaimed laser focus on recognizing revenues from Osiris's Biosurgery business during the Non-Reliance Periods, the magnitude of the financial accounting misstatements, and evidence showing their direct involvement in circumventing GAAP, improperly recognizing revenue, and violating federal securities laws and regulations.

### A. Defendants' False and Misleading Statements

#### 1. First Quarter 2014 (Ending March 31, 2014)

62. On May 12, 2014, Defendants filed Osiris's Form 10-Q with the SEC for the quarter ended March 31, 2014, in which they reported revenues of $10.054 million, gross profits of $7.842 million, net losses of $1.277 million, trade accounts receivable net of reserves of $11.763 million, and inventory of $2.337 million.

63. Defendants' Form 10-Q reported on "Concentration of Risk":

> We have historically provided credit in the normal course of business to contract counterparties and to the distributors of our product. Trade accounts receivable in the accompanying balance sheets consist primarily of amounts due from distributors of our Biosurgery products within the United States. During the first fiscal quarters of fiscal 2014 and 2013, revenues from one of the distributors of

our Biosurgery products, Stability Biologics, comprised approximately 58% and 64%, respectively, of our total Biosurgery product revenues. As of March 31, 2014 and December 31, 2013, receivables from this distributor comprised 20% and 57%, respectively, of our trade receivables. We expect all of our reported receivables to be fully collected. As discussed under "*Trade Accounts Receivable*," we have not incurred any bad debt expense for the three months ended March 31, 2014.

64. This statement was false and misleading and/or omitted facts necessary to make it not false and misleading. Defendants admitted on May 11, 2015 in Osiris's Form 10-Q for the quarter-ended March 31, 2015 that revenues from Stability Biologics for the quarter-ended March 31, 2014 comprised 15%, not 58%, of Osiris's total Biosurgery product revenues.[9]

65. This filing described Osiris's revenue recognition to investors:

*We recognize revenue from product distribution when title passes to the customer*. Title usually passes when the product is shipped to the customer and leaves our loading dock. In some situations, we store consigned inventory on site in freezers at hospital or clinic facilities and title passes to the customer when the product is used in a surgical procedure. In these instances we recognize the revenue upon notification of the completed surgical procedure. We verify the condition and status of all consigned inventory on at least a quarterly basis. Due to the nature of our products and the need to ensure they are maintained at the proper frozen temperature, we generally do not allow product returns.[10]

66. This filing described accounting for trade accounts receivable as:

Trade accounts receivable are reported at their net realizable value. We charge off uncollectible receivables when the likelihood of collection is remote. We set credit terms with individual customers, and consider receivables outstanding longer than the time specified in the respective customer's contract, typically 45-days, to be past due. As of March 31, 2014 and December 31, 2013, accounts receivable in the accompanying balance sheets are both reported net of a $78,000 allowance for doubtful accounts, respectively. We believe the reported amounts are fully collectible. Trade accounts receivable balances are not collateralized. We incurred $0 and $21,000 of bad debt expense in the first quarter 2014 and 2013 respectively.

[9] Osiris Form 10-Q for the quarterly period ended March 31, 2015 (filed 5/11/15), p11 (available at https://www.sec.gov/Archives/edgar/data/1360886/000110465915036502/a15-7834_110q.htm ) (accessed 9/7/17).

[10] *Id.*, p9.

67. The May 12, 2014 Form 10-Q included Debrabandere's and Jacoby's signed, sworn certifications that (a) Osiris's financial reports did not contain untrue statements of a material fact or omitted material facts necessary to make statements made not misleading, (b) Osiris's financial reports fairly presented in all material respects the financial condition, operations and cash flows, (c) they disclosed all significant weaknesses in internal controls over financial reporting to the Audit Committee and the outside auditor, and (d) they disclosed any fraud, whether or not material, that involved management or other employees who had a significant role in Osiris's internal controls over financial reporting.

68. Also on May 12, 2014, Osiris filed its Form 8-K and press release with the SEC entitled "Osiris Reports First Quarter 2014 Results: Revenue Up 25% and Gross Margin Improved from 73% to 78%" emphasizing "Increased product revenue for the quarter to $10.1 million - a 146% increase over the first quarter of 2013 and 25% from previous quarter" and "[i]mproved gross margin from 73% in previous quarter to 78% in the first quarter of 2014 – gross profit increased 169% over the first quarter of 2013 and 32% over the previous quarter."[11]

69. During the earnings conference call hosted by Debrabandere and Jacoby on May 13, 2014 discussing the results of the 2014 First Quarter, Debrabandere emphasized:

a. "We continued to experience very healthy growth in the first quarter, and reported sales of $10.1 million, a 146% growth over same-quarter last year, and a 25% growth over the previous quarter."

b. "[G]ross margin improved from 73% in the previous quarter to 78% this quarter."[12]

---

[11] Osiris May 12, 2014 Form 8-K, Ex. 99.1, available at https://www.sec.gov/Archives/edgar/data/1360886/000110465914037595/a14-12574_1ex99d1.htm (accessed 12/13/16).

[12] Osiris's (OSIR) CEO Lode Debrabandere on Q1 2014 Results – Earnings Call Transcript, available at http://seekingalpha.com/article/2215043-osiris-s-osir-ceo-lode-debrabandare-on-q1-2014-results-earnings-call-transcript?part=single (accessed 12/21/16).

70. Jacoby highlighted**:**

a. "On our balance sheet, we continue to report a very solid financial position, including almost $81 million in cash, investments and receivables as of the end of the first quarter."

b. "Our days sale outstanding of our trade receivables at the end of March had increased to approximately 90 days outstanding…[b]ut at the same time, I'm pleased to inform you that the quality of our trade receivables remains excellent. We did not incur any bad debt expense whatsoever during the first quarter of this year. Our inventory continues to turn over very rapidly, and we presently have less than 30 days sales in inventory."

c. "On the income statement, our product revenues during the first quarter of this year, as Lode said, was $10.1 million. It was almost 25% higher than what we experienced in the fourth quarter of FY13."

71. In response to the above statements on May 12 and 13, 2014, the price of Osiris shares rose $1.63 from its closing price of $14.75 on May 12, 2014 to close at $16.37 on May 14, 2014 -- about an 11% gain.

72. Defendants' statements were materially false and misleading and/or omitted information necessary to a reasonable investor to make them not misleading because:

a. Defendants knowingly overstated revenues by $2.897 million, or by over 40% of the properly recognizable amount ($7.157 million);

b. Defendants knowingly understated net losses by $957,000, or by 41% of the actual losses ($2.322 million);

c. Defendants knowingly overstated trade accounts receivable, net of reserves, by $3.136 million, or by over 36% of the proper amount ($8.627 million);

d. Defendants knowingly understated inventory by $912,000, or by about 28% of the proper amount ($3.249 million);

e. Debrabandere and Jacoby did not disclose they initiated extra-contractual or undocumented terms or arrangements with respect to sales transactions with certain distributors at the onset of the transactions and initiated concessions such as unusually long payment terms subsequent to the transactions that rendered their revenue recognition accounting improper under GAAP;

f. Debrabandere and Jacoby did not disclose material weaknesses in Osiris's internal controls over financial reporting.

73. Within two weeks of the above statements about Osiris's financial results for the quarter ended March 31, 2014, Defendant Jacoby sold 15,947 Osiris shares for total proceeds of $245,998.42. This sale was suspiciously timed and in an unusual quantity.

74. Osiris, Debrabandere and Jacoby made these misstatements concerning Osiris's revenue in the Form 10-Q for the first quarter of 2014, as well as the misstatements in the May 12, 2014 Form 8-K and May 13, 2014 earnings call. As Osiris's CEO, Debrabandere reviewed, approved, and was ultimately responsible for the accuracy of Osiris's reported financial results in the Form 10-Q, Form 8-K, and earnings call. In addition, Debrabandere and Jacoby certified Osiris's Form 10-Q and announced Osiris's false revenue during the earnings call.

**2. Second Quarter 2014 (Ending June 30, 2014)**

75. On August 7, 2014, Osiris filed its Form 8-K and press release with the SEC entitled "Osiris Therapeutics Announces Second Quarter 2014 Financial Results: Revenue Up 32% Over Previous Quarter" emphasizing "Increased product revenue for the quarter to $13.3 million - a 151% increase over Q2 2013 and a 32% increase over previous quarter" and "[held gross margin steady at 78% -- gross profit increased 172% over Q2 2013 and 32% over previous quarter."

76. Defendants stated in the August 7, 2014 press release:

> Product revenues during the second quarter of 2014 were $13.3 million, compared to $5.3 million during the second quarter of 2013, an increase of 151%. Gross margin during the second quarter was 78% compared to 72% during the second quarter of 2013. Gross profit was $10.4 million during the second quarter of 2014 and $3.8 million during the same period of 2013. The net loss from overall continuing operations was $1.4 million in the second quarter of 2014 after recognizing the net $1.3 non-cash loss in market value of stock received from the Mesoblast transaction and income taxes of $130,000. As of June 30, 2014, Osiris had $80.9 million of cash, investments and trade receivables.

77. The August 7, 2014 press release also quoted Debrabandere: "it is very encouraging that the quarter-over-quarter revenue growth of 32% was largely driven by our new

wound care sales team…. Revenue growth and bottom line improvement were impressive while we continue to invest and differentiate our products scientifically, clinically and through regulatory strategies."[13]

78. That same day, Defendants Debrabandere and Jacoby hosted an earnings conference call during which Debrabandere emphasized:

a. "So let's first summarize the key accomplishments of last quarter. So from a financial perspective, the second quarter was a record quarter for Osiris. We continued to experience very healthy growth and reported sales of $13.3 million, a 32% growth over the previous quarter."

b. "So I'll wrap up here with the new term and strategic priorities. First, obtain full reimbursement for Grafix and grow revenue."

c. "We do expect sales reps to generate anywhere between $80,000 to $100,000 a month after about 6 months. So that's a pretty aggressive metric, but that's what we would expect."

79. Jacoby stressed:

a. "Our day sales outstanding of our trade receivables at the end of June remains at approximately 90 days, as we are continuing our program of temporarily offering more generous payment terms to attract new customers. The quality of our trade receivables remains very high, and we have experienced very few collection problems."

b. "Turning to the income statement, as Lode mentioned, revenues from product distribution during the second quarter of this year was $13.3 million, which represents 32% growth over the prior quarter."

80. In response to the above statements, the price of Osiris shares rose $0.18 from its closing price of $14.66 on August 7, 2014 to close at $14.84 on August 8, 2014 -- about a 1.2% gain.

81. On August 11, 2014, Defendants filed Osiris's Form 10-Q for the quarter ended June 30, 2014 in which they reported revenues of $13.29 million, gross profit of $10.366 million,

---

[13] Osiris August 7, 2014 Form 8-K, Ex. 99.1, available at https://www.sec.gov/Archives/edgar/data/1360886/000110465914057878/a14-18622_1ex99d1.htm (accessed 12/13/16).

net losses of $1.885 million, trade accounts receivable of $16.89 million, and inventory of $5.54 million.

82. In this Form 10-Q, Defendants reiterated their revenue recognition procedure:

> *We recognize revenue from product distribution when title passes to the customer.* Title usually passes when the product is shipped to the customer and leaves our loading dock. In some situations, we store consigned inventory on site in freezers at hospital or clinic facilities and title passes to the customer when the product is used in a surgical procedure. In these instances we recognize the revenue upon notification of the completed surgical procedure. We verify the condition and status of all consigned inventory on at least a quarterly basis. Due to the nature of our products and the need to ensure they are maintained at the proper frozen temperature, we generally do not allow product returns.

83. The same document again described trade accounts receivable procedures as:

> Trade accounts receivable are reported at their net realizable value. We charge off uncollectible receivables when the likelihood of collection is remote. We set credit terms with individual customers, and consider receivables outstanding longer than the time specified in the respective customer's contract, typically 45-days, to be past due. As of June 30, 2014 and December 31, 2013, accounts receivable in the accompanying balance sheets are reported net of a $128,000 and $78,000 allowance for doubtful accounts, respectively. We believe the reported amounts are fully collectible. Trade accounts receivable balances are not collateralized. We incurred $50,000 of bad debt expense in the first half of fiscal 2014. We did not incur any bad debts expense in the first half of fiscal 2013.

84. The August 11, 2014 Form 10-Q included Debrabandere's and Jacoby's signed, sworn certifications that (a) Osiris's financial reports did not contain untrue statements of a material fact or omitted material facts necessary to make statements made not misleading, (b) Osiris's financial reports fairly presented in all material respects the financial condition, operations and cash flows, (c) they disclosed all significant weaknesses in internal controls over financial reporting to the Audit Committee and the outside auditor, and (d) they disclosed any fraud, whether or not material, that involved management or other employees who had a significant role in Osiris's internal controls over financial reporting.

85. In response to Defendants August 11, 2014 quarterly filing, the price of Osiris shares rose $0.59 from its closing price of $14.84 on August 8, 2014 to close at $15.43 on August 11, 2014 -- about a 4% gain.

86. Defendants' statements were materially false and misleading and/or omitted information necessary to a reasonable investor to make them not misleading for at least the following reasons:

a. Defendants knowingly overstated revenues by $4.084 million, or by 44% of the properly recognizable amount ($9.206 million);

b. Defendants knowingly overstated gross profit by $3.218 million, or by 45% of the actual amount ($7.148 million);

c. Defendants knowingly understated net losses by $3.368 million, or by 64% of the actual losses ($5.253 million):

d. Defendants knowingly overstated trade accounts receivable by $7.559, or by over 81% of the proper amount ($9.291 million);

e. Defendants knowingly overstated inventory by $187,000, or by about 3.5% of the proper amount ($5.353 million);

f. Debrabandere and Jacoby knowingly did not disclose they initiated extra-contractual or undocumented terms or arrangements with respect to sales transactions with certain distributors at the onset of the transactions and initiated concessions such as unusually long payment terms subsequent to the transactions that rendered their revenue recognition accounting improper under GAAP;

g. Debrabandere and Jacoby knowingly did not disclose material weaknesses in Osiris's internal control over financial reporting.

87. Osiris, Debrabandere and Jacoby made these misstatements concerning Osiris's revenue in the Form 10-Q for the second quarter of 2014, as well as the misstatements in the August 7, 2014 Form 8-K and earnings call that same day. As Osiris's CEO, Debrabandere reviewed, approved, and was ultimately responsible for the accuracy of Osiris's reported financial results in the Form 10-Q, Form 8-K, and earnings call. In addition, Debrabandere and Jacoby certified Osiris's Form 10-Q and announced Osiris's false revenue during the earnings call.

### 3. Third Quarter 2014 (Ending September 30, 2014)

88. On November 7, 2014, Osiris filed a Form 8-K and press release with the SEC entitled "Osiris Therapeutics Announces Third Quarter 2014 Financial Results: Revenue up 29% and Company Turned Profitable" emphasizing "Increased product revenue for the quarter to $17.2 million - a 29% increase over previous quarter and 150% increase over the same period last year. Held gross margin steady at 78% for the first three quarters of fiscal 2014" and "[c]ompleted the quarter with income from continued operations of $710,000, or $0.02 per share."

89. The November 7, 2014 press release further stated:

> Product revenues during the third quarter of 2014 were $17.2 million, compared to $6.9 million during the third quarter of 2013, an increase of 150%. Gross margin during the third quarter continued to be 78% compared to 73% during the third quarter of 2013. Gross profit was $13.4 million during the third quarter of 2014 and $5.0 million during the same period of 2013. Income from continuing operations was $710 thousand in the third quarter of 2014 after recognizing the net $524 thousand non-cash loss in market value of stock received from the Mesoblast transaction and income taxes of $104,000. As of September 30, 2014, Osiris had $79.8 million of cash, investments and trade receivables.

90. This press release also quoted Debrabandere: "This quarter represents a turning point for Osiris…. Our wound care business continues to drive revenue growth supported by the expansion of the sales force, the significant increase in the number of approvals for Medicare reimbursement and the positive scientific, clinical and pharmaco-economic data of Grafix®."[14]

91. That same day, Defendants Debrabandere and Jacoby hosted an earnings conference call where Debrabandere emphasized:

a. "First, from a revenue perspective. We had another record quarter for Osiris. We continued to experience very healthy growth and reported sales of $17.2 million

[14] Osiris November 7, 2014 Form 8-K, Ex. 99.1, available at https://www.sec.gov/Archives/edgar/data/1360886/000110465914078032/a14-23952_1ex99d1.htm (accessed 12/13/16).

for the quarter, 150% growth over the same period last year and almost 30% growth over the previous quarter,"

b. "The third quarter also marks the first quarter of real operating profitability."

c. "So let's first discuss the wound care business. Every quarter this year, we have had significant growth, largely attributed to the growth in our wound care business,"

d. "So let's wrap up our near term strategic objectives. First, obviously obtain full reimbursement for Grafix and grow revenue, that has been our objective since the beginning of the year."[15]

92. Jacoby stressed:

a. "Our balance sheet reports our very solid financial position, including almost $80 million in cash, investments and receivables at the end of the quarter."

b. "Our day sales outstanding of our trade receivables at the end of September is slightly higher than 90 days outstanding as we are continuing our program of temporary offering more generous payment terms to new customers."

c. "The quality of our trade receivables remains very high and we have experienced very, very few collection problems."

d. "Turning to the income statement. As Lode mentioned, our revenues from product distribution during the third quarter of this year was $17.2 million. This was a 229% increase over the prior quarter and 2.5x greater than the third quarter of fiscal 2013."

e. "We reported income from operations of $1.2 million for the quarter and an income from continuing operations of $710,000…. We reported basic and diluted income per common share from continuing operations and net income of $0.02 for the quarter."

93. In response to these statements, the price of Osiris's shares fell $0.34 from its closing price of $13.84 on November 6, 2014 to close at $13.50 on November 7, 2014 -- about a 2.5% loss.

94. On November 10, 2014, Defendants filed Osiris's Form 10-Q for the quarter ended September 30, 2014 in which they reported revenues of $17.24 million, gross profits of

[15] November 7, 2014 Osiris Therapeutics' (OSIR) CEO Lode Debrabandere on Q3 2014 Results – Earnings Call Transcript, available at http://seekingalpha.com/article/2656685-osiris-therapeutics-osir-ceo-lode-debrabandere-on-q3-2014-results-earnings-call-transcript (accessed 12/13/16).

$13.419 million, a net profit of $645,000, trade accounts receivable net of reserves of $21.446 million, and inventory of $8.84 million.

95. This filing repeated the Company's revenue recognition procedure:

> *We recognize revenue from product distribution when title passes to the customer.* Title usually passes when the product is shipped to the customer and leaves our loading dock. In some situations, we store consigned inventory in freezers on site at hospital or clinic facilities, and title passes to the customer when the product is used in a surgical procedure. In these instances we recognize the revenue upon notification of the completed surgical procedure. We verify the condition and status of all consigned inventory on at least a quarterly basis. Due to the nature of our products and the need to ensure they are maintained at the proper frozen temperature, we generally do not allow product returns.

96. The filing again represented trade accounts receivable:

> Trade accounts receivable are reported at their net realizable value. We charge off uncollectible receivables when the likelihood of collection is remote. We set credit terms with individual customers, and consider receivables outstanding longer than the time specified in the respective customer's contract, typically 45-days, to be past due. As of September 30, 2014 and December 31, 2013, accounts receivable in the accompanying balance sheets are reported net of a $328,000 and $78,000 allowance for doubtful accounts, respectively. We believe the reported amounts are fully collectible. Trade accounts receivable balances are not collateralized. We incurred $250,000 of bad debt expense in the first nine months of fiscal 2014. We did not incur any bad debts expense in the first nine months of fiscal 2013.

97. In response to Defendants' statements in the November 10, 2014, quarterly filing on Form 10-Q, the price of Osiris shares remained flat and closed at $13.48 that day.

98. Debrabandere and Jacoby again signed sworn certifications in this Form 10-Q that (a) Osiris's financial reports did not contain untrue statements of a material fact or omitted material facts necessary to make statements made not misleading, (b) Osiris's financial reports fairly presented in all material respects the financial condition, operations and cash flows, (c) they disclosed all significant weaknesses in internal controls over financial reporting to the Audit Committee and the outside auditor, and (d) they disclosed any fraud, whether or not

material, that involved management or other employees who had a significant role in Osiris's internal controls over financial reporting.

99. Defendants' statements were materially false and misleading and/or omitted information necessary to a reasonable investor to make them not misleading for at least the following reasons:

a. Defendants knowingly overstated revenues by $897,000, or by 5% of the properly recognizable amount ($16.307 million);

b. Defendants knowingly overstated gross profit by $636,000, or by approximately 5% of the actual amount ($12.783 million);

c. Defendants knowingly reported a $645,000 net profit when Osiris actually suffered a $372,000 net loss;

d. Defendants knowingly overstated trade accounts receivables net of reserves by $8.934 million, or by over 42% of the proper amount ($12.512 million);

e. Defendants knowingly overstated inventory by $973,000, or by over 12% of the proper amount ($7.867 million);

f. Debrabandere and Jacoby did not disclose they initiated extra-contractual or undocumented terms or arrangements with respect to sales transactions with certain distributors at the onset of the transactions and initiated concessions such as unusually long payment terms subsequent to the transactions that rendered their revenue recognition accounting improper under GAAP;

g. Debrabandere and Jacoby did not disclose material weaknesses in Osiris' internal controls over financial reporting.

100. Osiris, Debrabandere and Jacoby made these misstatements concerning Osiris's revenue in the Form 10-Q for the third quarter of 2014, as well as the misstatements in the November 7, 2014 Form 8-K and earnings call that same day. As Osiris's CEO, Debrabandere reviewed, approved, and was ultimately responsible for the accuracy of Osiris's reported financial results in the Form 10-Q, Form 8-K, and earnings call. In addition, Debrabandere and Jacoby certified Osiris's Form 10-Q and announced Osiris's false revenue during the earnings call.

**4. Fourth Quarter and Full Year 2014 (Ending December 31, 2014)**

101. On March 5, 2015, Defendants filed Osiris's Form 8-K and a press release with the SEC entitled "Osiris Therapeutics Reports Fourth Quarter and Full Year 2014 Financial Results: For the Full Year, Revenue Increased 146% and Company Reports Record Revenue in Fourth Quarter." Defendants highlighted "[r]eported product revenue of $59.9 million in 2014, up 146% from the prior year … [i]ncreased gross profit from operations from $17.7 to $46.7 million, up 164% from the prior year … [g]ross margin improved from 73% to 78% … and "[p]roduct revenue for the quarter rose to $19.3 million, a 138% increase compared to fourth quarter 2013."

102. With respect to fourth quarter financial results, Defendants stated:

> Product revenues during the fourth quarter of 2014 were $19.3 million, compared to $8.1 million during the fourth quarter of 2013, an increase of 138%. Gross margin during the fourth quarter was 78% compared to 73% during the fourth quarter of 2013. Gross profit was $15.1 million during the fourth quarter of 2014 compared to $5.9 million during the same quarterly period of 2013. Income from operations was $1.1 million in the fourth quarter of 2014 after recognizing income taxes of $89,000. As of December 31, 2014, Osiris had $84.2 million of cash, investments and receivables.

103. With respect to full year 2014 financial highlights, Defendants stated:

> Revenues of $59.9 million were recognized in fiscal 2014, a 146% increase over the prior year. Gross margin increased to 78% from 73% recognized in fiscal 2013, primarily as the result of manufacturing efficiencies….
>
> We reported a loss from continuing operations of $246,000, after recognizing income tax expense of $193,000. In fiscal 2013, we reported a loss from continuing operations of $1.1 million, after recognizing an income tax benefit of $1.3 million from the partial release of the valuation allowance on our deferred tax assets, which was facilitated by the gain recognized on the sale of our Prochymal assets.

104. The press release quoted Debrabandere: "We continue to grow revenue, add commercial talent and expand our pipeline in our Orthopedics, Sports Medicine and Wound Care

units…. Our investments in wound care resulted in rapid revenue growth in both commercial and federal payor segments with wound care sales quadrupling compared to 2013."[16]

105. That same day, Defendants Debrabandere and Jacoby hosted an earnings conference call during which Debrabandere emphasized:

a. "For the year 2014 our main goals were, first to transform the company to a commercial leader and grow revenue…,"

b. "From a revenue perspective, Osiris grew 146% year-over-year from $24 million in 2013 to about $60 million in 2014,"

c. "Let's now discuss briefly the fourth quarter where we completed the quarterly with revenue of $19.3 million compared to $17.2 million in the previous quarter representing 138% increase compared to the same period last year and 12% increase compared to previous quarter,"

d. "So I'll wrap up with our strategic priorities. We remain first and foremost laser focused to grow revenue."[17]

106. Jacoby used the conference call to highlight:

a. "Looking at our balance sheet we report our very solid financial position including $84 million in cash and investments and receivables at the end of the year."

b. "The days sale outstanding of our trade receivables at year end is close to 120 days. Overall the quality of our trade receivables remains very good although we have experienced some isolated instances of slow payments and have received some request for payments related to reimbursement issues."

c. "Turning to the income statement and as Lode mentioned revenue from product distribution during the fourth quarter of this year was $19.3 million which is 12% higher than the previous quarter and around 2.4 times greater than our fourth quarter 2013 revenues."

d. "We reported income from continuing operations of $1.1 million for the quarter…. We reported basic and diluted income per common share from continuing operations of [$0.03] for the quarter."

---

[16] Osiris March 5, 2015 Form 8-K, Ex. 99.1, available at https://www.sec.gov/Archives/edgar/data/1360886/000110465915016927/a15-5950_1ex99d1.htm (accessed 12/13/16).

[17] March 5, 2015 Osiris Therapeutics (OSIR) CEO Lode Debrabandere on Q4 2014 Results – Earnings Call Transcript, available at http://seekingalpha.com/article/2976596-osiris-therapeutics-osir-ceo-lode-debrabandere-on-q4-2014-results-earnings-call-transcript (accessed 12/13/16).

e. "Turning to the full year, we reported product revenues of almost $60 million for the fiscal year, which is almost two and a half times greater than our fiscal 2013 revenue."

f. "We reported a loss from continuing operations of $246,000 for the year…. We reported a loss from continuing operations for the year of $0.01[.]"

107. In response to these statements, the price of Osiris shares rose $1.46 from its closing price of $16.94 on March 5, 2015 to close at $18.40 on March 6, 2015 -- about an 8.6% gain.

108. On March 20, 2015, Defendants filed Osiris's Form 10-K for the year ended December 31, 2014 in which they reported fourth quarter and annual financial results.

109. With respect to Osiris's fourth quarter ended December 31, 2014, Defendants reported revenues of $19.319 million, gross profits of $15.069 million, net losses of $816,000, trade accounts receivable net of reserves of $24.307 million, inventory of $10.924 million.

110. For Osiris's year ended December 31, 2014, Defendants reported revenues of $59.867 million, gross profits of $46.696 million, net losses of $1.789 million, trade accounts receivable net of reserves of $24.307 million, inventory of $10.924 million.

111. The revue recognition policy was repeated:

> *We recognize revenue from product distribution when title passes to the customer.* Title usually passes when the product is shipped to the customer and leaves our loading dock. In some situations, we store consigned inventory on site in freezers at hospital or clinic facilities. No revenue is recognized upon the placement of inventory into consignment as we retain title and maintain the inventory on our balance sheet. For these products, revenue is recognized when we receive appropriate notification that the product has been used in a surgical procedure. We verify the condition and status of all consigned inventory on at least a quarterly basis. Due to the nature of our products and the need to ensure they are maintained at the proper frozen temperature, we generally do not allow product returns.

112. This filing stated with respect to trade accounts receivable:

> Trade accounts receivable are reported at their net realizable value. We charge off uncollectible receivables when the likelihood of collection is remote. We set credit terms with individual customers, and consider receivables outstanding longer than the time specified in the respective customer's contract, typically 45-days, to be past due. As of December 31, 2014 and 2013, accounts receivable in the accompanying balance sheets are reported net of a $1,256,000 and a $78,000 allowance for doubtful accounts, respectively. We believe the reported amounts are fully collectible. Trade accounts receivable balances are not collateralized. We have incurred bad debt expense of $1,178,000, $80,000 and $22,000 related to our Biosurgery operations during fiscal 2014, 2013 and 2012, respectively.

113. In response to this filing, the price of Osiris shares rose $0.28 from its closing price of $17.59 on March 20, 2015 to close at $17.87 on March 23, 2015 -- about a 1.6% gain.

114. The Form 10-K included Debrabandere's and Jacoby's signed, sworn certifications that (a) Osiris's financial reports did not contain untrue statements of a material fact or omitted material facts necessary to make statements made not misleading, (b) Osiris's financial reports fairly presented in all material respects the financial condition, operations and cash flows, (c) they disclosed all significant weaknesses in internal controls over financial reporting to the Audit Committee and the outside auditor, and (d) they disclosed any fraud, whether or not material, that involved management or other employees who had a significant role in Osiris's internal controls over financial reporting.

115. Defendants' statements about Osiris's fourth quarter ended December 31, 2014 were materially false and misleading and/or omitted information necessary to a reasonable investor to make them not misleading for at least the following reasons:

a. Defendants knowingly overstated revenues for the quarterly period by $1.154 million, or by 6% of the properly recognizable amounts ($18.165 million);

b. Defendants knowingly overstated gross profits by $153,000, or by about 1% of the actual amount ($14.916 million);

c. Defendants knowingly reported a net profit of $816,000 when Osiris actually suffered a $2.023 million net loss;

d. Defendants knowingly overstated trade accounts receivable net of reserves by $10.934 million, or by over 81% of the proper amount ($13.373 million);

e. Debrabandere and Jacoby knowingly did not disclose that they initiated extra-contractual or undocumented terms or arrangements with respect to sales transactions with certain distributors at the onset of the transactions and initiated concessions such as unusually long payment terms subsequent to the transactions that rendered their revenue recognition accounting improper under GAAP;

f. Defendants knowingly did not disclose that for at least one sales transaction to a distributor recorded in the 2014 fourth quarter at least Jacoby knew that evidence of the contractual arrangement(s) did not exist, rendering revenue recognition improper;

g. Debrabandere and Jacoby knowingly did not disclose material weaknesses in Osiris's internal controls over financial reporting.

116. Defendants' statements about Osiris's fiscal year ended December 31, 2014 were materially false and misleading and/or omitted information necessary to a reasonable investor to make them not misleading for at least the following reasons:

a. Defendants knowingly overstated revenues for the year by $9.032 million, or by approximately 17.8% of the properly recognizable amounts ($50.835 million);

b. Defendants knowingly overstated gross profits for the year by $5.747 million, or by 14% of the proper amount ($40.949 million);

c. Defendants knowingly understated net losses by $8.181 million, or by 82% of the proper amount ($9.97 million);

d. Defendants knowingly overstated trade receivables net of reserves by $10.934 million, or by about 82% of the proper amount ($13.373 million);

e. Defendants knowingly overstated inventory by $1.1 million, or by over 11% of the proper amount ($9.824 million);

f. Debrabandere and Jacoby knowingly did not disclose they initiated extra-contractual or undocumented terms or arrangements with respect to sales transactions with certain distributors at the onset of the transactions and initiated concessions such as unusually long payment terms subsequent to the transactions that rendered their revenue recognition accounting improper under GAAP;

g. Defendants knowingly did not disclose that for at least one sales transaction to a distributor recorded in the 2014 fourth quarter at least Jacoby knew that evidence of the contractual arrangement(s) did not exist, rendering revenue recognition improper;

h. Debrabandere and Jacoby knowingly did not disclose material weaknesses in Osiris's internal controls over financial reporting.

117. Osiris, Debrabandere and Jacoby made these misstatements concerning Osiris's revenue in the Form 10-K for the fourth quarter and full year of 2014, as well as the

misstatements in the March 5, 2015 Form 8-K and earnings call that same day. As Osiris's CEO, Debrabandere reviewed, approved, and was ultimately responsible for the accuracy of Osiris's reported financial results in the Form 10-K, Form 8-K, and earnings call. In addition, Debrabandere and Jacoby certified Osiris's Form 10-K and announced Osiris's false revenue during the earnings call.

**5. First Quarter 2015 (Ending March 31, 2015)**

118. On May 8, 2015, Defendants filed Osiris's Form 8-K and press release with the SEC entitled "Osiris Therapeutics Announces First Quarter 2015 Financial Results." In the release, Defendants emphasized "[i]ncreased product revenue for the quarter to $21.0 million - a 109% increase over Q1 2014" and the Company's "[h]eld gross margin remained consistent at 78%" while they ended the quarter "with after-tax income from operations of $1.4 million or $0.04 per share."[18]

119. Defendants summarized the quarter in this press release:

> Product revenues during the first quarter of 2015 were $21.0 million, compared to $10.1 million during the first quarter of 2014, an increase of 109%. Gross margin during the first quarter remained the same as the first quarter of 2014 at 78%. Gross profit was $16.4 million during the first quarter of 2015 and $7.8 million during the same period of 2014. The net income from continuing operations was $1.4 million in the first quarter of 2015 after recognizing income taxes of $0.6 million. As of March 31, 2015, Osiris had $101.6 million of total assets.

120. This press release quoted Debrabandere saying "I am encouraged by the continued growth of our business, despite the changing market dynamics we experienced in the first quarter[.]"

[18] Osiris May 8, 2015 press release (available at https://www.sec.gov/Archives/edgar/data/1360886/000110465915035892/a15-11203_1ex99d1.htm ) (accessed 9/7/17).

121. That same day, Defendants Debrabandere and Jacoby hosted an earnings conference call during which Debrabandere emphasized:

a. "Let's summarize the key accomplishments for the first quarter. We continue to grow our business and ended the first quarter with 21 million in revenue, more than double the revenue of $10 million in the first quarter of last year."

b. "[T]he Wound Care franchise continued to drive growth despite changes in our product portfolio and changes in the reimbursement landscape."

c. "So, I will wrap with a few strategic priorities for the second quarter. So we *remain laser focused to grow revenue*."

122. On the call, Jacoby stressed:

a. "Our balance sheet reports our very strong financial position including almost $87 million in cash, investments, and receivables at the end of the quarter."

b. "Our trade receivables at the end of the quarter grew to $32 million as a result of our offering generous payment terms to several of our largest and well established customers. Day sales outstanding of our trade receivables is close to 150 days presently. We do expect this to decline back to roughly 100 days outstanding by year-end as our generous payment terms expire."

c. "The quality of our trade receivables remain very good and we have not added to our bad debt reserve in the first quarter of fiscal 2015."

d. "Turning to the income statement, as Lode mentioned the revenues from product distribution during the first quarter of this year grew to $21 million which is a 9% increase over the previous quarter and over two times greater than our prior first quarter – prior year first quarter results."

e. "We reported basic and diluted income per common share of $0.04 for the quarter."

123. In response to these statements, the price of Osiris shares rose $1.83 from its closing price of $15.39 on May 7, 2015 to close at $17.22 on May 11, 2015 -- about a 12% gain.

124. On May 11, 2015, Defendants filed Osiris's Form 10-Q for the quarter ended March 31, 2015, in which they reported revenues of $21.003 million, gross profits of $16.294

million, net income of $1.377 million, trade accounts receivable net of reserves of $32.022 million, and inventory of $11.939 million.[19]

125. With respect to "Concentration of Risk" Defendants reported:

> We have historically provided credit in the normal course of business to contract counterparties and to the distributors of our product. Trade accounts receivable in the accompanying balance sheets consist primarily of amounts due from distributors of our Biosurgery products within the United States. During the first fiscal quarters of fiscal 2015 and 2014, revenues from one of the distributors of our Biosurgery products, Stability Biologics, comprised approximately 13% and 15%, respectively, of our total Biosurgery product revenues. As of March 31, 2015 and December 31, 2014, receivables from this distributor comprised 14% and 13%, respectively, of our trade receivables. We are experiencing some collection issues due to the termination of distributorships related to our new strategic partnerships with Arthrex and Stryker, and accordingly we have recorded an allowance. As discussed under "*Trade Accounts Receivable*," we have not incurred any bad debt expense for the three months ended March 31, 2015 or 2014.

126. This filing repeated Osiris's revenue recognition:

> *We recognize revenue from product distribution when title passes to the customer.* Title usually passes when the product is shipped to the customer and leaves our loading dock. In some situations, we store consigned inventory on site in freezers at hospital or clinic facilities. No revenue is recognized upon the placement of inventory into consignment as we retain title and maintain the inventory on our balance sheets. For these products, revenue is recognized when we receive appropriate notification that the product has been used in a surgical procedure. We verify the condition and status of all consigned inventory on at least a quarterly basis. Due to the nature of our products and the need to ensure they are maintained at the proper frozen temperature, we generally do not allow product returns.

127. This filing stated with respect to trade accounts receivable:

> Trade accounts receivable are reported at their net realizable value. We charge off uncollectible receivables when the likelihood of collection is remote. We set credit terms with individual customers, and consider receivables outstanding longer than the time specified in the respective customer's contract, typically 45-days, to be past due. As of March 31, 2015 and December 31, 2014, accounts receivable in the accompanying balance sheets are each reported net of $1.3 million allowance for doubtful accounts. Trade accounts receivable balances are not collateralized. We did not have bad debt expense in the first quarters of fiscal 2015 or 2014.

[19] Osiris Form 10-Q for the quarter ended March 31, 2015 (filed 5/11/15) available at https://www.sec.gov/Archives/edgar/data/1360886/000110465915036502/a15-7834_110q.htm#CondensedStatementsOfComprehensiv_152747 (accessed 9/7/17).

128. In response to this filing, the price of Osiris shares rose $0.30 from its closing price of $17.22 on May 11, 2015 to close at $17.22 on May 11, 2015 -- about a 1.7% increase.

129. The May 11, 2015 Form 10-Q included, Debrabandere's and Jacoby's signed, sworn certifications that (a) Osiris's financial reports did not contain untrue statements of a material fact or omitted material facts necessary to make statements made not misleading, (b) Osiris's financial reports fairly presented in all material respects the financial condition, operations and cash flows, (c) they disclosed all significant weaknesses in internal controls over financial reporting to the Audit Committee and the outside auditor, and (d) they disclosed any fraud, whether or not material, that involved management or other employees who had a significant role in Osiris's internal controls over financial reporting.

130. Defendants' statements were materially false and misleading and/or omitted information necessary to a reasonable investor to make them not misleading for at least the following reasons:

a. Defendants knowingly overstated revenues by at least $1.8 million;

b. Defendants knowingly included in the May 11, 2015 Form 10-Q the above-discussed income statement data for the quarterly period ended March 31, 2014 that, for the reasons discussed above, was knowingly materially false and misleading and/or omitted information necessary to investors to make the year-earlier data not false and misleading;

c. Defendants knowingly included in the May 11, 2015 Form 10-Q the above-discussed balance sheet data for the quarterly period ended December 31, 2014 that, for the reasons previously discussed, was knowingly false and misleading and/or omitted information necessary to investors to make the 2014 quarter- and year- ended December 31, 2014 data not false and misleading;

d. Debrabandere and Jacoby knowingly did not disclose that, during at least 2014, they initiated extra-contractual or undocumented terms or arrangements with respect to sales transactions with certain distributors at the onset of the transactions and initiated concessions such as unusually long payment terms subsequent to the transactions that rendered their revenue recognition accounting improper;

e. Defendants knowingly did not disclose that for at least one sales transaction to a distributor recorded in the 2014 fourth quarter Jacoby created a document subsequent to the original annual report for the year ended December 31, 2014 on Form 10-K (filed on March 20, 2015) to for the purpose of improperly recognizing revenue recognition during the fourth quarter of 2014;

f. Debrabandere and Jacoby knowingly did not disclose material weaknesses in Osiris's internal controls over financial reporting.

131. Within the next two weeks following these statements, Jacoby embarked on a second selling spree. This time he sold 20,000 shares of Osiris for total proceeds of $371,080. This sale was suspiciously timed and in an unusual quantity.

132. Osiris, Debrabandere and Jacoby made these misstatements concerning Osiris's revenue in the Form 10-Q for the first quarter of 2015, as well as the misstatements in the May 8, 2015 Form 8-K and earnings call that same day and the Form 10-Q filed on May 11, 2015. As Osiris's CEO, Debrabandere reviewed, approved, and was ultimately responsible for the accuracy of Osiris's reported financial results in the Form 10-Q, Form 8-K, and earnings call. In addition, Debrabandere and Jacoby certified Osiris's Form 10-Q and announced Osiris's false revenue during the earnings call.

133. Defendants stated on November 20, 2015 that Osiris's financial statements for the quarter ended March 31, 2015 were materially misstated, should not be relied on, and that because the statements were materially inaccurate, they would be restated.

**6. Second Quarter 2015 (Ending June 30, 2015)**

134. On August 5, 2015, Defendants filed Osiris's Form 8-K and press release with the SEC entitled "Osiris Therapeutics Announces Second Quarter 2015 Financial Results" and held its investor earnings conference call. This release emphasized: "Increased product revenue for the quarter to $23.7 million - a 78% increase over Q2 2014 and a 13% increase over previous

quarter[],” and “[c]ompleted the quarter with after-tax income from operations of $1.2 million or $0.03 per share and with $103 million in total assets.”[20]

135. In the press release, Defendants summarized the second quarter:

> Product revenues during the second quarter of 2015 were $23.7 million, compared to $13.3 million during the second quarter of 2014, an increase of 78%. Gross margin during the second quarter remained the same as the second quarter of 2014 at 78%. Gross profit was $18.5 million during the second quarter of 2015 and $10.4 million during the same period of 2014. The net income from continuing operations was $1.2 million in the second quarter of 2015 after recognizing income taxes of $0.4 million. As of June 30, 2015, Osiris had $103 million of total assets.

136. The August 5, 2015 quoted Debrabandere: “We remain ***laser focused on growing revenue*** and investing in our leading brands…. Despite the expiration of pass-through status for Grafix in early January, the wound care business continues to grow revenue by double-digits. The team has made tremendous progress in opening more accounts and increasing the number of patients treated with Grafix.”

137. That same day, Defendants Debrabandere and Jacoby hosted an earnings conference call[21] where Debrabandere emphasized:

a. “So, we continued to grow our business and reported revenues for the second quarter of $23.7 million. This represents a 13% growth compared to the previous quarter and a 78% growth over the same quarter last year”,

b. “The wound care business continues to experience healthy growth despite the expiration of pass-through status. This growth is driven by a large increase in the number of accounts ordering and the number of patients treated”, and

c. “So, I will wrap up with our key priorities. *We remain first laser focused on growing revenue*.”

---

[20] Osiris August 5, 2015 Form 8-K, Ex. 99.1, available at https://www.sec.gov/Archives/edgar/data/1360886/000110465915056153/a15-17019_1ex99d1.htm (accessed 9/7/17).

[21] Osiris August 5, 2015 earnings call transcript available at https://seekingalpha.com/article/3402325-osiris-therapeutics-osir-ceo-lode-debrabandere-on-q2-2015-results-earnings-call-transcript?part=single (accessed 9/7/17).

138. During the Q & A session, one analyst asked Debrabandere "[D]o you plan to continue to offer the enhanced payment terms for the stocking distributors through the end of the year or kind of when do you start to phase that program out?" Debrabandere responded, "That's already phased out. We just carry whatever we provided. We don't have stocking distributors anymore."

139. Jacoby explained the Company's financial results to call participants:

a. "Our balance sheet continues to report our very strong financial position including almost $86 million in cash, investments, and receivables at the end of the second quarter."

b. "Our trade accounts receivable at the end of the quarter grew by another $1.7 million to $37 million as a result of our sales increases…. We were not typically offering very extended payment terms presently although we are still collecting on sales made in prior quarters that included promotional longer payment terms."

c. "Turning to our income statement, as Lode mentioned, our revenues from product distribution during the second quarter of this year grew to $23.7 million which is 13% higher than the previous quarter and 78% greater than the prior year's second quarter revenues."

d. "As Lode mentioned, we reported basic and diluted earnings per common share of $0.03 for the quarter."

140. In response to these statements, the price of Osiris shares fell $2.02 from its closing price of $20.85 on August 4, 2015 to close at $18.83 on August 5, 2015 -- about a 9.7% loss.

141. On August 10, 2015, Defendants filed Osiris's Form 10-Q for the quarter ended June 30, 2015 in which they reported revenues of $23.688 million, gross profits of $18.546 million, net income of $1.164 million, trade accounts receivable net of reserves of $35.598 million, and inventory of $13.348 million.

142. This filing described Osiris's revenue recognition:

> *We recognize revenue from product distribution when title passes to the customer.* Title usually passes when the product is shipped to the customer and leaves our loading dock. In some situations, we store consigned inventory on site in freezers at hospital or

clinic facilities. No revenue is recognized upon the placement of inventory into consignment as we retain title and maintain the inventory on our balance sheets. For these products, revenue is recognized when we receive appropriate notification that the product has been used in a surgical procedure. We verify the condition and status of all consigned inventory on at least a quarterly basis. Due to the nature of our products and the need to ensure they are maintained at the proper frozen temperature, we generally do not allow product returns.

143. This filing stated with respect to trade accounts receivable:

Trade accounts receivable are reported at their net realizable value. We charge off uncollectible receivables when the likelihood of collection is remote. We set credit terms with individual customers, and consider receivables outstanding longer than the time specified in the respective customer's contract, typically 45-days, to be past due. As of June 30, 2015 and December 31, 2014, accounts receivable in the accompanying balance sheets is each reported net of $261,000 and $1.3 million allowance for doubtful accounts, respectively. During the fiscal quarter ended June 30, 2015, we entered into a settlement agreement with a former customer and wrote off $995,156 of accounts receivable against the allowance for doubtful accounts. This amount was fully reserved as of December 31, 2014.

Trade accounts receivable balances are not collateralized. We did not incur additional bad debt expense during the three months or six months period ended June 30, 2015. We incurred $50,000 of bad debt expense during the three months and six months period ended June 30, 2014, respectively.

144. In response to this filing, the price of Osiris shares rose $0.17 from its closing price on August 10, 2015 to close at $18.40 on August 11, 2015 -- about a 1% gain.

145. In the August 10, 2015 Form 10-Q, Debrabandere and Jacoby signed sworn certifications that (a) Osiris's financial reports did not contain untrue statements of a material fact or omitted material facts necessary to make statements made not misleading, (b) Osiris's financial reports fairly presented in all material respects the financial condition, operations and cash flows, (c) they disclosed all significant weaknesses in internal controls over financial reporting to the Audit Committee and the outside auditor, and (d) they disclosed any fraud, whether or not material, that involved management or other employees who had a significant role in Osiris's internal controls over financial reporting.

146. Defendants' statements were materially false and misleading and/or omitted information necessary to a reasonable investor to make them not misleading for at least the following reasons:

a. Defendants knowingly overstated revenues by at least $1 million;

b. The August 10, 2015 Form 10-Q included revenue data that Defendants knew was false and misleading or omitted information necessary to make the June 30, 2015 financial reports not false and misleading;

c. Defendants knowingly included in the August 10, 2015 Form 10-Q balance sheet data for the quarter- and year- ended December 31, 2014 that, as previously discussed, was knowingly and materially false and misleading and/or omitted information necessary to make the December 31, 2014 financial reports not false and misleading;

d. Defendants knowingly did not disclose that for at least one sales transaction to a distributor recorded in the 2014 fourth quarter Jacoby created a document subsequent to the original annual report for the year ended December 31, 2014 on Form 10-K (filed on March 20, 2015) to for the purpose of improperly recognizing revenue recognition during the fourth quarter of 2014;

e. Debrabandere and Jacoby knowingly did not disclose material weaknesses in Osiris's internal controls over financial reporting.

147. Osiris, Debrabandere and Jacoby made these misstatements concerning Osiris's revenue in the Form 10-Q for the second quarter of 2015, as well as the misstatements in the August 5, 2015 Form 8-K and earnings call that same day and the Form 10-Q filed on August 10, 2015. As Osiris's CEO, Debrabandere reviewed, approved, and was ultimately responsible for the accuracy of Osiris's reported financial results in the Form 10-Q, Form 8-K, and earnings call. In addition, Debrabandere and Jacoby certified Osiris's Form 10-Q and announced Osiris's false revenue during the earnings call.

**7. Third Quarter 2015 (Ending September 30, 2015)**

148. On November 6, 2015, Defendants filed Osiris's Form 8-K and press release announcing Osiris's third quarter 2015 financial results. Defendants summarized the results:

> Product revenues during the third quarter of 2015 were $24.3 million, compared to $17.2 million during the third quarter of 2014, an increase of 41%. Gross



010568-11 985556 V1

> margin during the third quarter remained the same as the third quarter of 2014 at 78%. Gross profit was $18.8 million during the third quarter of 2015 and $13.4 million during the same period of 2014. Net loss from continuing operations was $842,000. Other expense was $1.1 million, which mostly represented an unrealized loss on the stock of Mesoblast Ltd., held by the company at September 30, 2015. The company recognized an income tax benefit of $376,000. As of September 30, 2015, Osiris had $102.4 million of total assets.

149. This press release also disclosed, in part that it would have non-material changes to accounting treatment for certain transactions impacting the third quarter of 2015 and all of 2014:

> In consultation with the Company's independent registered accounting firm, the Company determined to change the accounting for its inventory consignment arrangement with PsyioRx, LLC from an accrual basis of accounting to a cash basis of accounting. This change will result in an increase in product revenues of approximately $0.8 million in the third quarter of 2015 and a decrease in product revenues of approximately $1.1 million in 2014. The approximate $0.3 million difference between the $0.8 million increase in product revenues for the third quarter of 2015 and the $1.1 million decrease in product revenues in 2014 will not be included as an accounts receivable as of the end of the third quarter of 2015, but will be recorded as product revenue in future periods when and if such amounts are actually received. The reason for this change in accounting for this particular contract is due to lack of sufficient evidence of the contractual arrangement to satisfy the applicable auditing standards, which is necessary to recognize revenue on an accrual basis under GAAP. In the absence of sufficient evidence, the Company is required to account for this contract under the cash basis of accounting, which means that revenues are recognized when cash receipts are actually received.

150. That same day, Defendants Debrabandere and Law[22] hosted an earnings conference call where Debrabandere emphasized Defendants' strict adherence to accounting standards:

---

[22] Without explanation and effective September 17, 2015, Law and Jacoby abruptly switched their CAO and CFO positions. The Company communicated that Jacoby "will continue to be an employee of the Registrant to assist Mr. Law on this transition and act in the Principal Accounting Officer role in this interim period" and "[t]here have been no other changes to the terms of Mr. Jacoby's employment." This switch occurred just two weeks before the close of Osiris's 2015 third quarter. No explanation was given in the September 21, 2015 Form 8-K for this switch. As a result of it, Law became responsible for executing SOX certifications going forward.

a. "[w]e reported revenues for the third quarter of $24.3 million and Greg [Law] will discuss in more detail the numbers and the associated accounting[],"

b. "[w]e are pleased with the progress of our international expansion plan and secured a significant order during the third quarter[,]" and "[i]t was decided not to book this order in the third quarter as *Osiris interprets revenue recognition standards very strictly.*"[23]

151. Law explained the Company's third quarter revenues:

a. "Turning to third quarter 2015, the company recorded $24.3 million in revenue for the quarter. This was a $600,000 increase from the previous quarter. Year-to-date revenue is $69 million, which is a $28.4 million increase over the same nine month period in 2014."

b. "Trade accounts receivable was $39.6 million at the end of the quarter."

152. During this conference call, a Piper Jaffray analyst asked, "should we anticipate any other changes during the quarter or does this pretty much bring this issue to a close?"

153. Law responded, "It's bringing the issue to a close, but they were distributing – there was a final amount of probation that was left, that was being sold before year end and the company had to tie it, but our revenue recognition was proper."

154. Debrabandere also assured that the accounting irregularity issues were resolved including payment duration:

> Remember Ted that we absolutely discontinue duration in 2014, so that will cost a very, very vast kind of sound observation and so that makes it all come to a closure and be done with it.

155. Contrary to Law's and Debrabandere's statements, the improper revenue recognition issues were far from solved and were actually far worse than Defendants had informed investors.

156. In response to Defendants' press release and conference call statements, the price

[23] Osiris Therapeutics (OSIR) CEO Dr. Lode Debrabandere on Q3 2015 Results – Earnings Call Transcript (November 6, 2015), available at http://seekingalpha.com/article/3657446-osiris-therapeutics-osir-ceo-dr-lode-debrabandere-q3-2015-results-earnings-call-transcript?part=single (accessed 12/20/16).

of Osiris shares fell $3.71 from its closing price of $18.25 on November 5, 2015 to close at $14.54 on November 6, 2015 -- about a 20% loss.

157. Defendants' statements were knowingly false and misleading and/or omitted information necessary to make them not false and misleading for at least the following reasons:

a. Defendants knowingly overstated distributor revenues in an amount yet to be determined;

b. Defendants knowingly included income statement data from the quarter ended September 30, 2014 that, as previously discussed, was materially false and misleading and/or omitted information necessary to make those financial statements not false and misleading;

c. Debrabandere and Law knowingly did not disclose that, during at least 2014, Debrabandere and Jacoby initiated extra-contractual or undocumented terms or arrangements with respect to sales transactions with certain distributors at the onset of the transactions and initiated concessions such as unusually long payment terms subsequent to the transactions that rendered their revenue recognition accounting improper;

d. Debrabandere and Law knowingly did not disclose that for at least one sales transaction to a distributor recorded in the 2014 fourth quarter Jacoby created a document subsequent to the original annual report for the year ended December 31, 2014 on Form 10-K (filed on March 20, 2015) to for the purpose of improperly recognizing revenue recognition during the fourth quarter of 2014;

e. Debrabandere and Law knowingly did not disclose material weaknesses in Osiris's internal controls over financial reporting.

158. Although not disclosed to investors in the November 6, 2015 Form 8-K, press release or conference call, the fraud at Osiris began to come to light during the third quarter of 2015 when Osiris's Auditor requested additional information regarding Osiris's revenue recognition practices. Then on November 16, 2015, Osiris filed its Form 10-Q for the third quarter of 2015 and, within that filing, for the first time disclosed to investors a material weakness in internal controls over financial reporting. Defendants also restated certain transactions and misleadingly assured investors that the restatements for material weakness in internal controls did not result in material misstatements of the financials.

159. In a Form 8-K filed four days later on November 20, 2015, Osiris disclosed that it would be restating its financial statements for the *first and second quarters of 2015* due to material errors, and in a Form 8-K filed on December 17, 2015, Osiris disclosed that its Auditor intended to resign.

160. On March 15, 2016, Osiris filed a Form 8-K revealing more bad news; that all of its financial statements issued for 2014 and the first three quarters of 2015 were unreliable and that the company intended to restate its financial statements for all of 2014 and the first three quarters of 2015. Osiris's restatement on Form 10-K/A for 2014 was filed on March 27, 2017. In that filing, Osiris disclosed material weaknesses in internal controls and corrected approximately $10.3 million in revenue overstatements for 2014. Despite repeated statements that the restatements for the three quarters of 2015 would be forthcoming, Defendants have not filed financial results of the first three quarters of 2015.

## B. Defendants' False and Misleading Statements During the Class Period Were Intended to Conceal Improper Conduct in Reporting Revenues from Transactions with Specific Distributors

### 1. Distributor A

161. In connection with Distributor A, Jacoby caused Osiris to falsely recognize revenue of over $1 million in the fourth quarter of 2014 for a transaction that did not occur until January 2015. Both Jacoby and Law made false and misleading representations and material omissions regarding transactions with Distributor A to Osiris's Auditor to conceal their scheme.

162. Further, in November 2015, Jacoby backdated a letter delivered to the Auditor to cover up the scheme to fraudulently recognize revenue in Osiris's published financial statements. Defendants filed those statements with the SEC and investors relied on them.

**a. Fraudulent and Improper Recognition of Revenue in the Fourth Quarter 2014 Related to Distributor A**

163. In the fourth quarter of 2014, Jacoby and Law caused Osiris to improperly recognize revenue of approximately $1.1 million in connection with a purported sale of Ovation® to Distributor A.

164. During December 2014, Debrabandere set and communicated a fourth quarter 2014 revenue target of "an absolute minimum $20 million," noting that Osiris had increased revenue by millions of dollars each of the previous quarters.

165. At that time, a significant amount of Osiris's Ovation inventory was consigned to Distributor A. To meet the revenue target, Debrabandere and Jacoby encouraged Distributor A to purchase approximately $1 million of the consigned inventory.

166. On December 23, 2014, Jacoby emailed Distributor A, writing:

> We need to chat about a bunch of things, including … most importantly, converting the consignment inventory into [Distributor A] owned product and the related payment terms. I'm hoping to convert much/most of the Ovation consignment into sales in Q4-2014 and want your thoughts and your suggestions on payment terms.

167. On January 5, 2015, Jacoby followed up with Distributor A in an email with the subject "Open Items," stating, "I'd like to convert roughly $1.2 million of the Consignment Inventory to sales as of 31 Dec 2014 …. Give some thought to payment terms on the Ovation sales and let's discuss to wrap this up." Three days later, in a January 8, 2015 email on which Law was copied, Jacoby stated that he continued to negotiate terms for the large order with Distributor A.

168. On January 13, 2015, Jacoby and Distributor A finally reached agreement as to the terms of the sale. Distributor A agreed to buy approximately $1.7 million in Ovation and to make anticipated monthly payments over the course of more than a year. Distributor A's email

correspondence with Jacoby also indicated that Distributor A's anticipated payments were contingent on Distributor A's ability to sell Osiris's products to end-users.

169. On February 2, 2015, with Jacoby's knowledge, Osiris further amended the sale to Distributor A to reclassify over $600,000 in Ovation back to consignment as of December 31, 2014. As a result, Osiris's books and records reflected a sale of approximately $1.1 million to Distributor A as of December 31, 2014.

170. Despite Jacoby and Law knowing that the sale terms were not finalized until 2015, Osiris recognized $1.1 million in revenue for the fourth quarter of 2014.

171. Osiris's recognizing the $1.1 million in revenue during the fourth quarter of 2014 did not comply with GAAP. First, because the terms of the sale were not finalized until at least January of 2015, persuasive evidence of an arrangement did not exist in 2014, and the revenue was not realized, realizable, or earned. Additionally, because Distributor A's ability to pay Osiris was contingent upon its ability to sell to end-users, the price was not fixed or determinable, and the revenue was not realized, realizable, or earned.

172. The improper recognition of this revenue was material because a reasonable investor would consider it important to be informed of Osiris's actual revenue and would consider it important that Osiris's officers were engaged in fraudulent conduct, including misstatements of revenue and a scheme to improperly inflate revenue.

173. In light of all of the above-alleged facts, including the circumstances leading to the accounting entries, as well as their own background, education, and job responsibilities, Jacoby and Law knew and/or were reckless in not knowing that recording the Distributor A revenue described above during the fourth quarter of 2014 was improper and did not comply with GAAP.

**b. The Fraudulent and Improper Recognition of Revenue in the First Quarter of 2015 Related to Distributor A**

174. On or about March 23, 2015, in email correspondence that included Law, Jacoby explained that Distributor A would be purchasing its remaining consigned inventory of Ovation. The purchase price of this product was approximately valued at $800,000.

175. Despite the fact that Distributor A's obligation to pay Osiris remained contingent upon its ability to sell-through to end-users, Osiris recognized approximately $800,000 in revenue for the first quarter of 2015.

176. Osiris's recognizing this revenue during the first quarter of 2015 did not comply with GAAP because the price was not fixed or determinable, and the revenue was not realized, realizable, or earned.

177. The improper recognition of this revenue was material because a reasonable investor would consider it important to be informed of Osiris's actual revenue and would consider it important that Osiris's officers were engaged in fraudulent conduct, including misstatements of revenue and a scheme to improperly inflate revenue.

**c. Additional Deceptive Conduct In Furtherance Of Their Scheme Regarding Distributor A, Including Deceit of Auditors**

178. On or about March 20, 2015 and May 11, 2015, Jacoby and Law signed letters to the Auditor in connection with the Auditor's 2014 audit and first quarter 2015 review of Osiris's financial statements. These letters are often referred to as management representation letters. In both of these letters, as well as their other interactions with the Auditors during the 2014 audit and first quarter 2015 review, Jacoby and Law made false and misleading representations and material omissions regarding transactions with Distributor A, including falsely and misleadingly representing that:

a. They had fulfilled their responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP;

b. There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements; and

c. They had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements.

179. Jacoby's and Law's March 20, 2015 letter to the Auditor also falsely represented that Osiris entered into an arrangement with Distributor A for the sale of Ovation in December 2014. This representation was false and misleading because persuasive evidence of the arrangement did not exist until January 2015. In that letter, they also falsely represented that they had fulfilled their responsibilities for the design, implementation, and maintenance of internal controls relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

180. In their interactions with the Auditor, Jacoby and Law also omitted the material information that Distributor A would not pay for product sold unless and until Distributor A sold the product to end-users. In other words, the revenue was contingent.

181. Additionally, during its third quarter 2015 review of Osiris's financial statements, the Auditor requested from Osiris, primarily through Jacoby and Law, detailed information regarding Osiris's revenue recognition practices. In connection with the Auditor's request, Jacoby and Law, with assistance from others in Osiris's finance department, prepared accounting memoranda that purported to describe how Osiris recognized revenue with respect to its distributors. In connection with these accounting memoranda, Jacoby and Law made material false and misleading statements and omissions to the Auditor and to Osiris's outside accounting consultant.

182. Among other things, both Jacoby and Law participated in the drafting and editing

of an accounting memorandum titled "[Distributor A] – Discussion of Revenue Related to Year End Ovation Sales," which was "from" Jacoby and another Osiris accountant. This memorandum was an accounting record that was materially false and misleading because it stated that by December 31, 2014, Distributor A agreed to purchase over $1 million in Ovation. Further, after both the Auditor and consultant commented that it was inappropriate to recognize revenue if Osiris was to be paid from the cash flow generated by Distributor A's sale of product, Jacoby and Law directly or indirectly edited the memo to omit this fact.

183. Among other things, both Jacoby and Law also participated in the drafting and editing of an accounting memorandum titled "[Distributor A] – Q1 2015 Sale." This memorandum was an accounting record that was materially false and misleading because it omitted the material fact that Osiris was to be paid from the cash flow generated by Distributor A's sale of product.

184. Additionally, on or about November 5, 2015, Jacoby created, signed, and sent to Distributor A's CEO a false record in the form of a letter backdated to nearly a year earlier – December 29, 2014 – that claimed to "memorialize" the terms of Osiris's sale to Distributor A of approximately $1.1 million in consignment inventory of product. Jacoby emailed the letter to Distributor A from his personal, non-Osiris email account, stating:

> … attached is something that I think you should find and send to me in an email saying you had this in your file from late last year, and just came across it – and that it does memorialize our several phone conversations …. Call me if necessary, but write a wonderfully warm and convincing email, please – send it to my Osiris email.

185. Shortly thereafter, Jacoby caught a typo in the letter and sent a corrected version, again from his personal, non-Osiris email account, with the subject line "Understanding."

186. As requested by Jacoby, Distributor A's CEO then sent the backdated letter to Jacoby's Osiris email account. Jacoby replied, stating in part, "glad you found this and glad you

don't have the email retention policy that we do …." The backdated letter and email chain were then forwarded to the Auditor.

187. In light of all of the above-alleged facts, including the circumstances leading to the accounting entries, as well as their background, education, and job responsibilities, Jacoby and Law knew or were reckless in not knowing that their conduct was deceptive and resulted in additional materially false and misleading statements and omissions being made to Osiris's Auditor and included in SEC filings that investors relied upon.

**d. Osiris Overstated the Distributor A Transactions**

188. The SEC complaint against Defendants charges that, in 2015, Defendants improperly and deliberately recognized both the $1.1 million in revenue during the fourth quarter of 2014 and $800,000 in revenue during the first quarter of 2015. Osiris's Form 10-K/A restating revenues in the fourth quarter of 2014 Defendants admitted: "**For one transaction in the fourth quarter of 2014**, the Company determined that the persuasive evidence of an arrangement was not met until January 2015 and the price was not fixed and determinable in the quarter that the revenues were previously recognized, nor was it determined to be fixed and determinable as of the first quarter of 2015…. The Company also sold product to the same distributor **during the first quarter of 2015**…. **Correcting this revenue recognition error will result in a decrease in product revenues of approximately $0.8 million, net of cost of sales, in the first quarter of 2015**."

**2. Distributor B**

189. During the first quarter of 2015, Osiris recognized revenue on product purportedly sold to Distributor B, a Turkish distributor that was negotiating a potential distributor agreement with Osiris. Defendants recognized revenue from Distributor B despite Distributor B only making a partial payment and needing to obtain regulatory approval to import the product into

Turkey. Further, in September and October of 2015, Distributor B still lacked regulatory approval to import product and had not requested additional product from Defendants; nonetheless, Jacoby, Law, and Montgomery caused Osiris to book revenue of nearly $2 million based on fictitious orders from Distributor B. Montgomery backdated and signed a letter purporting to describe the fictitious order.

190. In the first quarter of 2015, Defendants caused the Company to record and improperly recognize at least $650,000 in revenue associated with a purported product sale to Distributor B. Further, Jacoby, Law, and Debrabandere engaged in other deceptive conduct regarding Distributor B, including deliberately making material false and misleading statements and material omissions to the Auditor that were included in SEC filings that investors relied upon.

### a. The Fraudulent and Improper Recognition of Revenue in the First Quarter of 2015 Related to Distributor B

191. In early 2015, Osiris's sales department began negotiating a potential distributor agreement with Distributor B. Osiris's efforts to finalize the terms of the deal intensified by the end of the first quarter 2015 because the revenue from the transaction with Distributor B was intended to satisfy Debrabandere's "laser focused" revenue target for that quarter.

192. On or about March 27, 2015, Montgomery notified Debrabandere that Distributor B was "uncomfortable paying for" Grafix, but was willing to pay for Cartiform; however, Osiris did not have available enough Cartiform to fill a potential order by Distributor B. Debrabandere responded "[w]e have flexibility. We can include [G]rafix and later swap to [C]artiform when we have it[.]" Debrabandere also understood that Distributor B did not plan to pay in full for its order and stated that it "would be great" if Distributor B was willing to make a partial payment.

193. On March 31, 2015 – the last day of the first quarter – Jacoby executed a distribution agreement and closing checklist with Distributor B on behalf of Osiris. That same day, Jacoby provided a copy of the executed agreements to Law in an email stating that Osiris would be receiving a wire for $100,000.

194. The Effective Date of the distribution agreement was April 1, 2015. Pursuant to the terms of the distribution agreement, Distributor B agreed to pay Osiris $100,000 by March 31, 2015 for an "initial stocking order of Cartiform 10mm" and agreed to acquire an additional $650,000 of Cartiform or Grafix by December 31, 2015; however, Osiris's agreement to ship the products to Distributor B was contingent on Distributor B's ability to obtain required licenses, certificates, and permits. Further, at this time, Distributor B was not seeking regulatory approval to import Grafix into Turkey.

195. On March 31, 2015, at Jacoby's direction, Osiris transferred 80 units of Cartiform and 844 units of Grafix from its production facility to a third-party storage facility in Baltimore, Maryland. Osiris paid the fees associated with the transfer and storage of the product. There was no set timeframe for delivery of the product.

196. By the end of the first quarter 2015, Distributor B had paid Osiris only $100,000, had not received regulatory approval for the shipment of Osiris products into Turkey, had not physically received any Osiris product, and, upon information and belief, had not provided Osiris with a purchase order.

197. Nonetheless, Osiris recognized $750,000 of revenue associated with sales of product to Distributor B for the first quarter of 2015 in SEC filings that investors relied upon.

198. It was improper for Osiris to recognize at least $650,000 in revenue during the first quarter of 2015 because persuasive evidence of an arrangement did not exist, delivery had not been accomplished, and the revenue was not realized, realizable, or earned.

199. The SEC complaint against Defendants charges that Defendants deliberately overstated revenues in the third quarter of 2015 by $650,000 in first quarter of 2015.

200. The improper recognition of this revenue was material because a reasonable investor would consider it important to be informed of Osiris's actual revenue and would consider it important that Osiris's officers were engaged in fraudulent conduct, including misstatements of revenue and a scheme to improperly inflate revenue.

201. In light of all of the above-alleged facts, including the circumstances leading to the accounting entries, as well as their background, education, and job responsibilities, Jacoby, Law, and Debrabandere knew or were reckless in not knowing that recording the Distributor B revenue described above during the first quarter of 2015 was improper and did not comply with GAAP.

**b. Additional Deceptive Conduct In Furtherance of Their Scheme Regarding Distributor B, Including Deceit of Auditors**

**(1) First and Second Quarters of 2015**

202. As described above, Debrabandere directed that Osiris include Grafix in the purported sale to Distributor B, despite the fact that Distributor B did not want to purchase that product at the time.

203. On or about May 11, 2015, Jacoby, Law, and Debrabandere, signed the management representation letter to the Auditor in connection with the Auditor's first quarter 2015 review of Osiris's financial statements. Jacoby, Law, and Debrabandere's letter, as well as their other interactions with the Auditors during the first quarter 2015 review, made false and

misleading representations and material omissions regarding transactions with Distributor B, including falsely and misleadingly representing that:

a. They had fulfilled their responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP;

b. There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements; and

c. They had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements.

**(2) Third and Fourth Quarters 2015**

204. Additionally, to further the scheme to artificially inflate Osiris's revenue, Jacoby, and Law caused Osiris to book additional revenue from Distributor B for the third quarter of 2015. They did so even though Distributor B still had not received regulatory approval to import the product into Turkey, had not paid the $650,000 contemplated by the April 1, 2015 contract, and had not requested additional product during the third quarter. In fact, in connection with $1.7 million of the revenue, they booked revenue to the third quarter several weeks after the third quarter had ended.

205. First, on September 30, 2015 – the last day of the third quarter – Jacoby and Law received email correspondence from Montgomery that proposed a "Turkey order" of $250,000. Montgomery explained that Osiris might "need" the proposed order if another distributor ordered less than $1 million in product. Later in the day, Law emailed Osiris employees that "Turkey is coming, no [other distributor]."

206. As a result of Jacoby's and Law's conduct, Osiris improperly booked $250,000 in revenue associated with Distributor B.

207. Then, in October 2015, Jacoby and Law caused Osiris to improperly book another $1.7 million in revenue that was purportedly associated with Distributor B.

208. By mid-October, Jacoby and Law were aware that revenue would have to be decreased due to the errors in accounting for revenue associated with Distributor C, which is explained below. In furtherance of their revenue recognition scheme, on or about October 9, 2015, Jacoby asked Law to provide him with "the exact [Distributor C] number for each of the three quarters of this year – both our gross and then the actual." Law responded by providing a spreadsheet that included an analysis of "Revenue per [Distributor C]," "[Osiris] Revenue Recognized," and a "Difference" totaling over $1.7 million.

209. On or about October 18, 2015 – eighteen days into the fourth quarter – Montgomery sent Jacoby a spreadsheet reflecting "the order we discussed …," which falsely documented sale of $1.7 million in product. Jacoby knew that this documentation would be used in Osiris's financials filed with the SEC and relied upon by investors.

210. On or about October 19, 2015, also within the fourth quarter, Jacoby emailed Law "[w]e need to talk about Turkey tomorrow – there is a $1.7M order that could/should be Q3[.]"

211. The next day, Montgomery sent Jacoby an email that attached an unsigned letter dated September 30, 2015, which was saved with the name "Montgomery Q3 Order.docx." The letter falsely stated that Distributor B "would like to purchase" $1.7 million in Osiris products. Later in the day, Jacoby emailed Law a copy of this false letter, which was signed by Montgomery.

212. After receiving the letter, Law instructed the assistant controller to work with another employee to book the $1.7 million. Law also provided the letter to Osiris's customer service department, which requested a copy "to serve as the purchase request[.]"

213. Law also asked Montgomery for correspondence to support the $1.7 million "sale." In response, Montgomery claimed that the order was verbal.

214. The backdated letter to Jacoby and signed by Montgomery was provided to Osiris's Auditor.

215. Both the $250,000 and $1.7 million were reversed in November 2015, after Osiris's Auditor determined that it would not be appropriate for Osiris to recognize the revenue.

216. Jacoby and Law knew or were reckless in not knowing that their conduct related to the booking of the $250,000 and $1.7 million for the third quarter of 2015 was fraudulent and deceptive and resulted in additional materially false and misleading statements and omissions being made to Osiris's Auditor and included in SEC filings that investors relied upon.

**3. Distributor C**

217. In connection with Distributor C, in 2015 Jacoby, Law, and Debrabandere caused Osiris to recognize revenue on consigned inventory, thereby disregarding Osiris's accounting policy, and prematurely recognized revenue on product that had not yet been sold to end-users. Further, Jacoby and Law also caused Osiris to recognize revenue at a higher "list price" instead of the price at which they knew or were reckless in not knowing, it was actually sold and which Osiris was actually paid.

218. Specifically, during the first two quarters of 2015, Jacoby and Law caused Osiris to improperly recognize revenue related to Distributor C by using the list price for BIO4 instead of the actual sales price of the product to calculate revenue, resulting in a material overstatement of revenue. Additionally, during the first three quarters of 2015, as a result of the conduct of Jacoby, Law, and Debrabandere, Osiris improperly recognized revenue on consigned product, resulting in a material overstatement of revenue. Further, due to the conduct of Jacoby and Law, Osiris made additional false and misleading representations and material omissions regarding transactions with Distributor C.

219. In December 2014, Osiris entered into an exclusive service agreement for BIO4 with Distributor C. Debrabandere signed the agreement, and Law and Jacoby were involved in assessing the accounting implications of the agreement and were aware, or should have been aware, of the agreement's terms.

220. Pursuant to the agreement, Distributor C served as the exclusive marketer and promoter of BIO4. When a customer purchased the product, Distributor C would obtain an order from the customer and would provide certain details of the order to Osiris. The customer would pay Distributor C. Distributor C was entitled to a commission payment and administrative fee, which were to be netted out of the payments Distributor C then made to Osiris.

**a. Defendants Used the Wrong Pricing to Fraudulently and Improperly Recognize False Revenues from Distributor C in the First, Second, and Third Quarters of 2015**

221. Osiris's 2014 Form 10-K and its Forms 10-Q for the first and second quarters of 2015 represented that, in connection with its agreement with Distributor C, Osiris would recognize as revenue the amounts charged to customers for the product. Osiris's Form 10-Q for the third quarter of 2015 declared that, "[t]he amount we recognize as revenue is based on our list price for [the product]. We reconcile and record the difference, if any, between the revenue previously recognized and the selling price when we receive the data from [Distributor C] on a monthly basis."

222. Distributor C and Osiris had a "list price" for the product; however, Distributor C was permitted to sell the product at a discount to the list price as long as it paid Osiris a contractually-determined minimum average fee for the product.

223. Distributor C did not provide Osiris with the specific price that it charged each customer. Instead, Distributor C provided Osiris with reconciliation reports that provided Osiris

with the actual revenue related to sales and data through which Osiris could calculate the average sales price ("ASP").

224. Distributor C's first sales under the agreement occurred in February 2015 and Osiris recognized revenue stemming from those sales using the "list price."

225. On or about March 13, 2015, Distributor C provided Osiris with a report that stated the actual revenue related to sales for February 2015. Osiris's assistant controller forwarded the report to Jacoby and explained that the Distributor C report did not match the list price in Osiris's system, meaning that the revenue amount would not reconcile.

226. On or about April 2, 2015, Osiris's assistant controller again expressed concern with Defendants' practice of relying on the list price to recognize revenue. When Jacoby was notified about the concerns, he expressed frustration with the assistant controller, stating in part, "I've tried repeatedly to explain materiality to [the assistant controller] without success." Jacoby then followed up with an email to Osiris employees, stating that list prices would be used "for all internal reporting." Shortly thereafter, the assistant controller sent Jacoby, Law, and others a report that used list price to calculate "total sales" for the first quarter.

227. On or about April 7, 2015 – a month before Osiris filed its Form 10-Q for the first quarter of 2015 – Distributor C provided Osiris's finance department with a document that stated the actual revenue related to sales for February and March 2015, and which provided data that would permit Osiris to calculate the ASP. That same day, the report was provided to Jacoby and Law.

228. For the second quarter of 2015, Osiris's finance department received reconciliation reports on or about May 7, 2015, June 5, 2015, and July 13, 2015. The July 13, 2015 report was provided to Jacoby and Law prior to Osiris's filing of its Form 10-Q for the

second quarter of 2015. The July 13, 2015 report provided, among other information, the actual revenue related to sales for June 2015 and ASP information through June 2015.

229. The information provided in these reports confirmed that by relying on the list price to recognize revenue, Osiris was overstating its revenue. Nonetheless, Osiris did not adjust the revenue it had previously recorded for these transactions to the actual amounts earned. Instead, it continued to recognize revenue for transactions with Distributor C at the inflated list price, resulting in Osiris overstating revenue in the first and second quarters of 2015.

230. For the third quarter of 2015, Osiris's finance department received reconciliation reports on or about August 11, 2015, September 9, 2015, and October 7, 2015. Prior to Osiris's filing of its Form 10-Q for the third quarter of 2015, the August 11, 2015 and the October 7, 2015 reports were provided to Jacoby and Law and the September 2015 report was provided to Law. The October 2015 report provided, among other information, the actual revenue related to sales for September 2015 and ASP information through September 2015.

231. The information provided in these reports demonstrated that by relying on the list price to recognize revenue, Osiris was overstating its revenue. Nonetheless, Osiris did not properly and adequately adjust the revenue it had previously recorded for these transactions to the actual amounts earned, resulting in Osiris overstating revenue in the third quarter of 2015.

232. Osiris's recognition of this revenue during the first, second, and third quarters of 2015 did not comply with GAAP because the revenue was not realized, realizable, or earned.

233. The improper recognition of this revenue was material because a reasonable investor would consider it important to be informed of Osiris's actual revenue and would consider it important that Osiris's senior officers were engaged in fraudulent conduct, including misstatements of revenue and a scheme to improperly inflate revenue.

234. In light of all of the above-alleged facts, including the circumstances leading to the accounting entries, as well as their background, education, and job responsibilities, Jacoby and Law knew or were reckless in not knowing that recording the Distributor C revenue described above at list price was improper and did not comply with GAAP.

**b. Defendants' Fraudulently and Improperly Recognized Revenue on Consigned Product in the First, Second, and Third Quarters of 2015 Related to Distributor C**

235. In Osiris's Forms 10-Q for the first, second, and third quarters of 2015, filed with the SEC and relied upon by investors, Osiris disclosed that no revenue was recognized upon the placement of inventory into consignment. Instead, Defendants represented that for consigned product, revenue was only recognized when Osiris received appropriate notification that the product had been used in a surgical procedure.

236. Pursuant to its agreement with Distributor C, Osiris would sometimes supply the product to end-user customers on consignment. For consignment inventory, title remained with Osiris until the end-user customer used the inventory, at which point title and risk of loss transferred to the customer.

237. Despite the fact that some product shipments constituted consignment, by March 2015, Debrabandere directed that Osiris account for ***all*** shipments of the product as "sales" so that revenue could be recognized. In an email to Osiris employees, including Jacoby, Law, and Montgomery, he explained, "[w]e cannot wait until we receive PO's to book these as a sale …. Goal is to get to $1 million bio4 this quarter."

238. Osiris employees, including the assistant controller, expressed concern about booking all shipments as sales, even if the shipments were for consignment. For example, the assistant controller told Jacoby that she believed "we should record the shipment as consignment

and then do the accrual per the implant information if and when we receive it from Distributor C."

239. Jacoby and Law were both involved in follow-up communications with Osiris employees regarding Debrabandere's instruction to book consignment as sales. Further, in March 2015, Law noted to Osiris employees, including Jacoby, that it was critical for Osiris to obtain the sales price from Distributor C; otherwise, Osiris would not be permitted to recognize "gross" (i.e., "top line" revenue).

240. In contravention of GAAP, Jacoby followed Debrabandere's instructions and directed that all shipments, including those that included consigned inventory, would be booked as a sale for which revenue would be recognized. As a result, Osiris improperly overstated revenue by recognizing revenue on consigned inventory.

241. It was improper for Osiris to recognize revenue on this consigned product during the first, second, and third quarters of 2015 because the revenue was not realized, realizable, or earned.

242. It was also improper for Osiris to recognize revenue on consigned product during the first, second, and third quarters of 2015 because it was in violation of Osiris's publicly touted policy, which stated that Osiris did not recognize revenue on consigned product.

243. The improper recognition of this revenue was material because a reasonable investor would consider it important to be informed of Osiris's actual revenue and would consider it important that Osiris's senior officers were engaged in fraudulent conduct, including misstatements of revenue and a scheme to improperly inflate revenue.

244. In light of all of the above-alleged facts, including the circumstances leading to the accounting entries, as well as their background, education, and job responsibilities, Jacoby,

Law, and Debrabandere knew or were reckless in not knowing that recording revenue based on product consigned to Distributor C's customers as described above was improper and did not comply with GAAP.

**c. Jacoby's and Law's Additional Misstatements in Furtherance Of Their Scheme Regarding Distributor C**

245. In its Form 10-Q for the third quarter of 2015 that was signed by Jacoby and Law and also certified by Law, Osiris falsely and misleadingly stated "[d]uring the third quarter of 2015, the Company received true-up information from another distributor which showed the average price for product sales during the year."

246. Similarly, in its Form 8-K filed on November 20, 2015 and signed by Law, Osiris falsely and misleadingly stated "[d]uring the third quarter of 2015, the Company received final pricing information from another distributor which showed the average price for product sale during the year."

247. These statements were false and misleading because, in reality, Osiris's finance department, including Jacoby and Law, received pricing information from Distributor C before the third quarter. In fact, Osiris had received pricing information from Distributor C that included the ASP for the first and second quarters of 2015, prior to the filing of Osiris's Forms 10-Q for those quarters. The third quarter Form 10-Q and November 20, 2015 Form 8-K also failed to disclose the material information that Osiris was recognizing revenue on consigned product and that Osiris's accounting errors related to Distributor C also included adjustments necessary due to the recognition of revenue on consigned product.

248. These statements were material because a reasonable investor would consider it important to understand the total amount of revenue that was misstated by Osiris, the reasons for

the misstatement of revenue, and that Osiris's officers were engaged in fraudulent conduct, including misstatements of revenue and a scheme to improperly inflate revenue.

249. Jacoby and Law knew or were reckless in not knowing that Osiris received information regarding pricing prior to the third quarter and that Osiris's accounting errors related to Distributor C were also caused by the recognition of revenue on consigned product and, therefore, that the statements in the Forms 10-Q and 8-K were false and misleading and omitted material information.

**d. Additional Deceptive Conduct In Furtherance of their Scheme Regarding Distributor C, Including Deceit of Auditors**

250. On or about May 11, 2015, August 10, 2015, and November 16, 2015, Jacoby, Law, and Debrabandere signed or otherwise acknowledged management representation letters to the Auditor in connection with the Auditor's first, second, and third quarter 2015 reviews of Osiris's financial statements. Through these letters, as well as their other interactions with the Auditors during the first, second, and third quarter 2015 reviews, Jacoby, Law, and Debrabandere made false and misleading representations and material omissions regarding transactions with Distributor C, including falsely and misleadingly representing that:

a. They had fulfilled their responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP;

b. There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements; and

c. They had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements.

251. Jacoby, Law, and Debrabandere also omitted material information in communications with Osiris's Auditor, including that Osiris was recognizing revenue on product consigned to Distributor C's customers. Jacoby and Law further omitted the material information

that Osiris had received pricing information from Distributor C prior to the filing of its Forms 10-Q for the first and second quarter of 2015.

252. Additionally, during its third quarter 2015 review of Osiris's financial statements, the Auditor requested from Osiris, primarily through Jacoby and Law, detailed information regarding Osiris's revenue recognition practices. In connection with the Auditor's request, Jacoby and Law, with assistance from others in Osiris's finance department, prepared accounting memoranda that purported to describe how Osiris recognized revenue with respect to its distributors. In connection with these accounting memoranda, Jacoby and Law made material false and misleading statements and omissions to the Auditor and to Osiris's outside accounting consultant.

253. Among other things, the accounting memorandum titled "[Distributor C] Revenue Recognition Memo," which was reviewed by Jacoby and Law, was materially false and misleading because it stated that prior to September 2015, Distributor C did not share the ASP with Osiris and that Osiris booked revenue at list price because it did not have the ASP information.

254. In light of all of the above-alleged facts, including the circumstances leading to the accounting entries, as well as their background, education, and job responsibilities, Jacoby, Law, and Debrabandere knew and/or were reckless in not knowing that their conduct was deceptive and that their conduct resulted in additional materially false and misleading statements and omissions being made to Osiris's Auditor.

**4. Distributor D**

255. During 2014 and the first three quarters of 2015, Debrabandere, Jacoby, and Law caused Osiris to improperly and prematurely recognize revenue on millions of dollars in transactions related to sales to Distributor D. Defendants did this knowing that Distributor D

already had significant accounts receivable and, upon information and belief, would not pay Osiris until the Osiris products were sold to end-users. Jacoby and Law also made material false and misleading statements and material omissions to Osiris's auditor regarding Distributor D.

**a. The Fraudulent and Improper Recognition of Revenue Throughout 2014 and the First Three Quarters of 2015 Related to Distributor D**

256. In 2014 and 2015, Distributor E, an entity associated with Distributor D, served as an Osiris distributor. Distributor E acted as a commissioned sales agent for Osiris by, among other things, selling Ovation and Grafix to Distributor D.

257. Through Distributor E, Osiris sold product to Distributor D during 2014 and the first three quarters of 2015. Osiris's sales to Distributor D were purportedly made with 30-day payment terms; however, upon information and belief, Osiris allowed Distributor D to withhold payment until product was resold to an end-user – often much later than 30 days. Despite this contingency, Osiris repeatedly prematurely recognized revenue on product sold to Distributor D.

258. Throughout 2014 and the first three quarters of 2015, Distributor D withheld payments beyond 30 days. Debrabandere did not object to this practice and, upon information and belief, Debrabandere agreed and/or was aware that Distributor D would not make payments to Osiris until product was sold to an end-user.

259. By 2015, Jacoby and Law knew or were reckless in not knowing that Distributor D's payments were contingent, and/or that Osiris's allowance for Distributor D's doubtful accounts was insufficient. Nonetheless, they failed to make any change in Osiris's accounting related to Distributor D. In January 2015, Jacoby emailed the assistant controller and copied Law, attaching a copy of Distributor D's statement, which showed a balance due of over $7 million and over $2 million 120 days past due. The subject line of the email read "Come Explain to me why [Debrabandere] shouldn't fire you, me and [Law] over the attached."

260. During 2015, Osiris's Auditor was concerned about the extensive outstanding amounts due to Osiris from Distributor D. Law informed the Auditor that Osiris had lost a collections employee and falsely stated that the loss of the employee was causing the delay in collecting from Distributor D. In July 2015, Jacoby reached out to Distributor E's CEO to notify him that Osiris had not received any payments from Distributor D since April 2015.

261. In September 2015, the CEO of Distributor E notified Jacoby and Law that Distributor E was taking over all remaining accounts payable to Osiris by Distributor D for Ovation, and sent an "intended" 10-month payment plan for nearly $6 million. With respect to Grafix, the CEO of Distributor E explained that he needed to speak with Debrabandere and noted that a doctor had been injured and had not been available for a few months. When Law asked what the doctor's injury had to do with Osiris receiving payments for the product, the CEO of Distributor E responded, "[w]e have a territory of hospital (1 doctor as the key) and have helped out Osiris immensely with purchasing inventory above and beyond our needs so if you don't want us to return the Grafix then you need to understand where we can sell it. [Debrabandere] and I are speaking tomorrow." Jacoby forwarded this email to Debrabandere who responded "[y]up indeed."

262. In connection with transactions with Distributor D, Osiris prematurely recognized over $14 million in revenue during 2014 and over $4 million in revenue during the first three quarters of 2015. Osiris's recognition of this revenue during the quarters in which it was recognized was improper and did not comply with GAAP because Distributor D routinely paid Osiris belatedly and its payments to Osiris remained contingent upon the sale of product to end-users; therefore, the price was not fixed or determinable and revenue was not realized, realizable, or earned.

263. The improper premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of Osiris's actual revenue each quarter and would consider it important that Osiris's officers were engaged in fraudulent conduct, including misstatements of revenue and a scheme to improperly inflate revenue.

264. In light of all of the above-alleged facts, including the circumstances leading to the accounting entries, as well as their background, education, and job responsibilities, Debrabandere and Jacoby knew or were reckless in not knowing that recording the Distributor D revenue described above during 2014 and the first three quarters of 2015 was improper and did not comply with GAAP.

**b. Osiris's Restatement of the 2014 Revenue Associated with Distributor D.**

265. On March 27, 2017, Osiris filed a Form 10-K/A for the year ended 2014 restating approximately $7.6 million in revenue associated with Distributor D.

**c. Other Deceptive Conduct in Furtherance of their Scheme Regarding Distributor D, Including Deceit of Auditors**

266. On or about May 12, 2014, August 11, 2014, November 10, 2014, March 20, 2015, May 11, 2015, August 10, 2015, and November 16, 2015, Debrabandere signed or otherwise acknowledged letters to the Auditor in connection with the Auditor's 2014 audit and first, second, and third quarters of 2014 and 2015 reviews of Osiris's financial statements. Through these letters, as well as other interactions with the Auditors, Debrabandere made false and misleading representations and material omissions regarding transactions with Distributor D, including falsely and misleadingly representing that:

a. He had fulfilled his responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP;

b. There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements; and

c. He had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements.

267. Additionally, in the March 20, 2015 letter, which was in connection with the Auditor's 2014 audit of Osiris's financial statements, Debrabandere falsely represented that he had fulfilled his responsibilities for the design, implementation, and maintenance of internal controls relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

268. Additionally, in the May 11, 2015, August 10, 2015, and November 16, 2015 letters, which were in connection with the Auditor's first, second, and third quarter 2015 reviews of Osiris's financial statements, Debrabandere falsely represented that there were no material transactions, side agreements, or other arrangements (either written or oral) that had not been disclosed to the Auditor and properly recorded in the accounting records underlying the financial statements.

269. On or about May 11, 2015, August 10, 2015, and November 16, 2015, Jacoby and Law signed or otherwise acknowledged letters to the Auditor in connection with the Auditor's first, second, and third quarters of 2015 reviews of Osiris's financial statements. Through these letters, as well as other interactions with the Auditors, Jacoby and Law made false and misleading representations and material omissions regarding transactions with Distributor D, including falsely and misleadingly representing that:

a. They had fulfilled their responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP;

b. There were no material transactions, side agreements, or other arrangements (either written or oral) that have not been disclosed to the Auditor and properly recorded in the accounting records underlying the financial statements; and

c. They had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements.

270. In 2015, Law also misrepresented to the Auditor that Osiris's collections issues with Distributor D were the result of the loss of a collections employee.

271. Jacoby also misrepresented to the Auditor that Distributor D was an end-user of Osiris's products.

272. Additionally, Debrabandere, Jacoby, and Law did not notify the Auditor that Distributor E took over the payment obligations of Distributor D in September 2015, nor did they disclose Distributor E's intended payment plan to the Auditor. In fact, in October 2015 – the month after the payment plan was established – Jacoby responded to an Auditor inquiry regarding the relationship between Distributor D and Distributor E by stating that Osiris was unaware of a "formal relationship" between the entities.

273. In light of all of the above-alleged facts, including the circumstances leading to the accounting entries, as well as their background, education, and job responsibilities, Jacoby, Law, and Debrabandere knew or were reckless in not knowing that their conduct was deceptive, including that their conduct resulted in additional materially false and misleading statements and omissions being made to Osiris's Auditor.

**C. Defendants' Misstatements Were Material**

274. Osiris's false and/or misleading misstatements and omissions regarding its revenue recognition policies and practices, and misstatements and omissions regarding its restatement information were material. Osiris's revenue was important to the reasonable investor. Revenue was an important financial metric to the company, analysts utilized the metric in assessing the performance of the company, and it would have been important to a reasonable investor to know Osiris's actual revenue, the fact that Osiris misstated revenue, and that Osiris did not recognize revenue as described in its SEC filings. It also would have been important to a reasonable investor to know about the fraudulent scheme in which Osiris's executives engaged.

**D. The Truth Emerges**

275. Contrary to Defendants' assurances that revenue recognition issues were resolved, they were –and continue to be– far from over. Significant additional material and adverse information that reasonable investors consider important to their investment decisions, all known to the Defendants, began to creep into the marketplace just ten days after their November 6, 2015 statements.

276. On November 16, 2015, Defendants filed Osiris's Form 10-Q for the quarterly period ended September 30, 2015 in which they reported revenues of $25.331 million and net losses of $658,000. They reported trade accounts receivable, net of reserves, of $37.857 million.

277. Defendants stated as follows concerning Osiris's revenue recognition:

> *We recognize revenue from product distribution when title passes to the customer.* Title usually passes when the product is shipped to the customer and leaves our loading dock. On occasion, customers purchase product and request that the Company store the purchased product in segregated freezers at the Company's facility. In those cases, title passes to the customer and the customer accepts all risks associated with the purchased product. Customers may request this service of the Company in instances where they want to ensure that supply of product is available to them and they do not have the capability to store the product themselves in special freezers at -80 degrees Celsius. In some situations we store consigned inventory on site in freezers at hospital or clinic facilities. No revenue is recognized upon the placement of inventory into consignment as we retain title and maintain the inventory on our balance sheets. For these products, revenue is recognized when we receive appropriate notification that the product has been used in a surgical procedure….[24]

278. While continuing to cover their tracks, for the first time, Defendants admitted "Correction of Prior Period Financial Statements":

> In connection with preparing the Company's financial statements for the quarter ended September 30, 2015, the Company reviewed the timing of revenue recognition under contracts with its distributors. As a result of this review, the

[24] Osiris Form 10-Q for the quarterly period ended September 30, 2016 (filed 11/16/15), p14, available at https://www.sec.gov/Archives/edgar/data/1360886/000155837015002707/osir-20150930x10q.htm#DescriptionofBusinessandSignificantAccou (accessed 12/20/16).

Company determined to correct the revenue recognition for three contracts which will result in a decrease in product revenues of $1.8 million in the first quarter of 2015, a decrease in product revenue of $1.0 million in the second quarter, an increase in product revenues of $0.8 million in the third quarter of 2015 and a decrease in product revenues of $1.1 million in 2014.

* * *

Upon subsequent review in connection with the Company's review of its third quarter 2015 financial statements, the Company determined, in consultation with its independent registered public accounting firm, that the transactions did not meet certain conditions for revenue recognition in the fourth quarter of 2014, and the first and second quarters of 2015. Specifically to the transaction in the fourth quarter of 2014, the Company determined that the persuasive evidence of an arrangement was not met until January 2015 and the price was not fixed and determinable in the quarter that the revenues were previously recognized. As a result, the Company is required to account for the contract with this distributor under the cash basis of accounting…. Correcting this revenue recognition error in one contract will result in an increase in product revenues of approximately $0.8 million, net of cost of sales, in the third quarter of 2015 and a decrease in product revenues of approximately $1.1 million, net of cost of sales, in 2014….

The Company also sold product to the same distributor during the first quarter of 2015. The Company is also recognizing this sale on the cash-basis of accounting. Correcting this revenue recognition error will result in a decrease in product revenues of approximately $0.8 million, net of cost of sales, in the first quarter of 2015. The $0.8 million of accounts receivable will not be included as an accounts receivable as of the end of the first quarter of 2015, but will be recorded as product revenue in future periods when and if such amounts are actually received.

Also during the first quarter of 2015, the Company recognized a $0.7 million sale, net of cost of sales, to a distributor that ordered products for sale outside of the United States. During its review of all distributor contracts undertaken during the third quarter 2015 period close process, the Company also determined that revenue recognition of this first quarter 2015 is appropriate in a future period when the distributor achieves full regulatory approval in the country where they will be selling the product. This determination was made because the distributor has the right to return the product if regulatory approval is not achieved.

During the third quarter of 2015, the Company received true-up information from another distributor which showed the average price for product sales during the year. This distributor first sold product for the Company during the first quarter 2015. The distributor has the right to sell the product at any price, as long as it sell above a set minimum price. The impact of this price adjustment was $0.3 million revenue reduction during the first quarter 2015 and $1.0 million reduction during the second quarter 2015. The revenue adjustment was offset by a reduction in cost of goods sold, commissions and fees for that revenue. This adjustment was preliminarily recorded during the third quarter of 2015 but a determination was made to adjust previous quarters to reflect the proper impact of

the adjustment to previously reported periods.[25]

279. Defendants made the false or misleading statement that these "adjustments" were not material:

> *Materiality Assessment*
> The Company evaluated the effect of the adjustment in accordance with the Securities and Exchange Commission ("SEC") Staff Accounting Bulletin No. 99 (SAB 99) and SEC Staff Accounting Bulletin No. 108, "Effects of Prior Year Misstatements on Current Year Financial Statements" (SAB 108) and determined the ***cumulative impact of the adjustment was not material to our previously issued annual audited financial statements for the year ended December 31, 2014*** and therefore, amendments of our previously filed 2014 Form 10-K is not required. We restated previously reported results for the three months ended December 31, 2014 and the year ended December 31, 2014 in this Quarterly Report on Form 10-Q for the quarter ended September 30, 2015. The accompanying condensed financial statements as of September 30, 2015 reflect the aforementioned immaterial corrections.[26]

280. And, Defendants acknowledged their failure to design and maintain adequate internal controls:

> *Internal Control over Financial Reporting*
>
> The Company did not design and maintain controls to ensure that (1) adequate written documentation existed for contracts with distributors in order to ensure that persuasive evidence of the contractual arrangement existed and the terms were fixed and determinable with respect to revenue recognition and (2) adequate analysis and documentation existed for new distributor contracts to ensure timely and accurate recording of revenue in accordance with GAAP.
>
> Management also determined that this material weakness existed as of December 31, 2014, March 31, 2015, and June 30, 2015. This material weakness did not result in a material misstatement to the Company's annual financial statements for the year ended December 31, 2014. However, management concluded that this material weakness, if un-remediated, could have, in future reporting periods, resulted in a material misstatement to the Company's annual or interim consolidated financial statements that would not have been prevented or detected by its internal controls. Accordingly, management has determined that this control deficiency constituted a material weakness.

---

[25] *Id.,* pp7-8.

[26] *Id.*, pp8-9.

281. In response to these partially corrective statements, the price of Osiris shares fell $3.01 from its closing price of $13.98 on November 16, 2015 to close at $10.97 on November 17, 2015 – about a 22% loss.

282. Defendants' statements were materially false and misleading and/or omitted facts necessary to make them not misleading for at least the following reasons:

a. For the quarter ended March 31, 2014, within the November 16, 2015 filing Defendants restated revenues, gross profits, and net losses downward by $0.00 even though, as discussed above, Defendants knowingly overstated revenues by $2.897 million, overstated gross profits by $1.74 million, and understated net losses by $987,000;

b. For the quarter ended June 30, 2014, within the November 16, 2015 filing Defendants restated revenues, gross profits, and net losses downward by $0.00 even though, as discussed above, Defendants knowingly overstated revenues by $4.084 million, overstated gross profits by $3.218 million, and understated net losses by $3.368 million;

c. For the quarter ended September 30, 2014, within the November 16, 2015 filing Defendants restated revenues, gross profits, and net losses downward by $0.00 even though, as discussed above, Defendants overstated revenues by $897,000, overstated gross profits by $636,000, and reported a $645,000 profit when Osiris actually suffered a $372,000 net loss;

d. For the quarter ended December 31, 2014, within the November 16, 2015 filing Defendants restated revenues downward by $1.072 million even though, as discussed above, Defendants overstated revenues by $1.154 million;

e. For the year ended December 31, 2014, within the November 16, 2015 filing Defendants restated revenues downward by $1.072 million even though, as discussed above, Defendants overstated revenues by $9.032 million;

f. For the year ended December 31, 2014, within the November 16, 2015 filing Defendants restated gross profits downward by $836,000 even though, as discussed above, Defendants overstated gross profits by $5.747 million;

g. For the quarter ended December 31, 2014, within the November 16, 2015 filing Defendants restated net losses downward by $836,000 even though, as discussed above, Defendants understated net losses by $2.023 million;

h. For the year ended December 31, 2014, within the November 16, 2015 filing Defendants restated net losses downward by $836,000 even though, as discussed above, Defendants understated net losses by $8.181 million;

i. Defendants knowingly did not disclose that during the preparation of Osiris's financial statements for the quarter ended September 30, 2015 its executives and outside auditor BDO had disagreements over Defendants' revenue recognition

and the sufficiency of Osiris's internal controls over financial reporting;

j. Defendants knowingly did not disclose the magnitude of required adjustments to- and restatements of- Osiris's historical financial reports;

k. Defendants knowingly did not disclose that Debrabandere and Jacoby initiated extra-contractual or undocumented terms or arrangements with respect to sales transactions with certain distributors at the onset of the transactions and initiated concessions such as unusually long payment terms subsequent to the transactions that rendered their revenue recognition accounting improper under GAAP;

l. Defendants knowingly did not disclose that for at least one sales transaction to a distributor recorded in the 2014 fourth quarter former CFO Jacoby knew there was no evidence of a contract at the time revenue was recognized from it and, subsequently, he created a document and backdated it.

283. In the November 16, 2015 Form 10-Q reporting results for the Fiscal Quarter ending September 30, 2015, Debrabandere and Law signed sworn certifications that (a) Osiris's financial reports did not contain untrue statements of a material fact or omitted material facts necessary to make statements made not misleading, (b) Osiris's financial reports fairly presented in all material respects the financial condition, operations and cash flows, (c) they disclosed all significant weaknesses in internal controls over financial reporting to the Audit Committee and the outside auditor, and (d) they disclosed any fraud, whether or not material, that involved management or other employees who had a significant role in Osiris's internal controls over financial reporting.

284. This certification was false and/or misleading and omitted facts a reasonable investor would want to know. Four days later, on November 20, 2015 Defendants would issue an announcement on SEC Form 8-K that they were forced to restate their revenues because the revenues were materially misstated for all of 2014 and the first three quarters of 2015.

## E. Post-Class Period Disclosures Reveal the Accounting Fraud

285. Shortly after the Class Period, while sorting through the full extent of Defendants' undisclosed accounting improprieties, Defendants, BDO and others uncovered information revealing the nature and extent of Defendants' Class Period accounting fraud.

286. On December 17, 2015, Osiris filed its Form 8-K with the SEC announcing its Auditor BDO USA, LLP ("BDO") notified the Company on December 11, 2015 of its intention to resign.

287. BDO's resignation was caused by a disagreement with Osiris about timing of revenue recognition and related internal controls. Osiris represented that these disagreements were over financial statements for 2014 and the first and second quarters of 2015.[27]

288. This filing revealed important and previously undisclosed information to investors that was not contained in Osiris's Form 10-Q filed on November 16, 2015 reporting for the quarterly period ended September 30, 2015 –namely, that during the preparation of that Form 10-Q, BDO disagreed with Defendants about the timing of revenue recognition under distributor contracts and about the sufficiency of Osiris's internal controls over financial reporting.

289. On January 15, 2016, *SeekingAlpha* published a contributor's report entitled "Osiris: Aggressive Channel Stuffing, Accounting Irregularities Or Outright Fraud?"[28] The author quoted Debrabandere's response to a question about Osiris's trade receivables during his November 19, 2015 presentation at the Canaccord Genuity Medical Technology and Diagnostics Forum:

> For example, PhysioRx, we have publicly stated that we booked $1.1 million in the fourth quarter of 2014. Of that, $1.1 million, $800,000 has been received already in cash, and the remaining $300,000 is expected before this year end. So, that is pretty much done. There is still a $0.7 million order out there of PhysioRx from the first quarter. And then there is the Stability acquisition of Ovation from the 4th quarter of 2014 that makes up to the about $7 million total.

---

[27] Osiris Form 8-K (filed 12/17/16) (available at https://www.sec.gov/Archives/edgar/data/1360886/000110465915085545/a15-25185_18k.htm )

[28] Available at https://seekingalpha.com/article/3812496-osiris-aggressive-channel-stuffing-accounting-irregularities-outright-fraud

290. According to the author, and as borne out by Osiris's SEC filings, Debrabandere falsely and misleadingly represented –or omitted facts that reasonable investors would consider important –concerning the supposed $1 million of receivables coming in from PhysioRx and about $6 million coming in from Stability. However, Osiris's Form 10-Q for the third quarter-ended September 30, 2015 (filed November 16, 2015, just three days before the Canaccord Forum) reported that, as of September 30, 2015, receivables from Stability comprised just 2%, or approximately $757,140, of Osiris's $37.857 reported million trade accounts receivables.

291. On February 3, 2016, Defendants filed Osiris's Form 8-K announcing Debrabandere "resigned" and that it was for "personal reasons." The announcement camouflaged Debrabandere's effective firing.

292. That the Board effectively fired Debrabandere also follows from:

a. He was the Company's only employee with an employment agreement.

b. Debrabandere's employment agreement provided him with significant benefits if he resigned for good reason. Under the agreement, in addition to paying any amount otherwise owed, Osiris must pay him a lump sum in an amount equal to six months of base salary (based on his 2015 annual base salary of $396,000, this amount equaled $198,000) and provide six months of medical, life, and disability benefits (having an estimated value of approximately $10,000).

c. Yet, despite the benefits he stood to receive in the event he resigned for good reason, Debrabandere signed the Separation And Release Agreement before him, which replaced and superseded his employment agreement. The Separation And Release Agreement provided in part for:

   i. no lump sum payment;

   ii. reimbursement for the premium or cost of group medical, dental or vision coverage under COBRA for three months;

   iii. extension of the expiration dates of a relatively small portion of Debrabandere's out-of-the-money stock options;

   iv. the requirement that he provide consulting services (uncompensated) that included assisting with preparation of earnings calls, press releases, business matters, and the identification of potential successors from February 16, 2016 through May 31, 2016.

d. And, in connection with the Separation And Release Agreement, Debrabandere

forfeited options to purchase 163,750 shares of Osiris common stock.

293. On March 15, 2016, Defendants filed Osiris's Form 8-K announcing it received a subpoena from the SEC concerning its investigation into Osiris's historic accounting practices.

294. Also on March 15, 2016, Defendants Law and Osiris filed Osiris's Form NT 10-K announcing they would not timely file Osiris's annual report on Form 10-K for the year ended December 31, 2015. Defendants explained:

> The Company is in the process of (i) completing its accounting review of revenue recognition under contracts with distributors that was previously reported in its audited financial statements for the year ended December 31, 2014 and its unaudited interim financial statements for quarterly periods in 2015, (ii) completing amendments to certain periodic reports previously filed with the Securities and Exchange Commission (the "SEC") and (iii) transitioning to a new independent registered public accounting firm that will require additional time to conduct an audit of the Company's 201' financial statements. The specific date of the filing of the 2015 Annual Report is not yet known, but the Company currently does not expect to file the Annual Report within the extension period of fifteen calendar days provided under Rule 12b-25 of the Securities Exchange Act of 1934, as amended.

295. And, the same day, Defendants Law and Osiris (assisted by Defendant Debrabandere pursuant to the terms of his separation agreement) announced in Osiris's Form 8-K and press release "the Company expects to receive a written notice of deficiency for noncompliance with NASDAQ listing qualifications for the failure to timely file periodic financial reports with the SEC" and "[t]he Company plans to avail itself of the process provided by NASDAQ to maintain its listing while working to regain compliance with the listing qualifications by filing its 2015 Form 10-K and completing amendments to certain other SEC filings[.]"

296. On May 11, 2016, Defendants Law and Osiris filed Osiris's Form NT 10-Q announcing they would not timely file Osiris's quarterly report on Form 10-Q for the quarter ended March 31, 2016. They explained:

> the Company is in the process of completing its accounting review of revenue recognition under contracts with distributors that was previously reported in its financial statements in 2014 and 2015, completing amendments to certain periodic reports previously filed with the Securities and Exchange Commission and transitioning to a new independent registered public accounting firm that will require additional time to audit the Company's financial statements and conduct a review of the Company's unaudited Q1 2016 financial statements. The specific date of the filing of the Q1 2016 Quarterly Report is not yet known, but the Company currently does not expect to file the Q1 2016 Quarterly Report within the extension period of five calendar days provided under Rule 12b-25 of the Securities Exchange Act of 1934, as amended.

297. On August 9, 2016, Defendants Law and Osiris filed Osiris's Form NT 10-Q disclosing they would not timely file Osiris's quarterly report on Form 10-Q for the quarter ended June 30, 2016. They explained:

> the Company is in the process of completing its accounting review of revenue recognition under contracts with distributors that was previously reported in its financial statements in 2014 and 2015, completing amendments to certain periodic reports previously filed with the Securities and Exchange Commission and transitioning to a new independent registered public accounting firm that will require additional time to audit the Company's 2015 financial statements and conduct a review of the Company's unaudited Q2 2016 financial statements. The specific date of the filing of the Q2 2016 Quarterly Report is not yet known, but the Company currently does not expect to file the Q2 2016 Quarterly Report within the extension period of five calendar days under Rule 12b-25 of the Securities Exchange Act of 1934, as amended.

298. On November 14, 2016, Defendants Law and Osiris filed Osiris's Form NT 10-Q disclosing they would not timely file Osiris's quarterly report on Form 10-Q for the quarter ended September 30, 2016. They explained:

> the Company is in the process of completing its accounting review of revenue recognition under contracts with distributors that was previously reported in its financial statements in 2014 and 2015, completing amendments to certain periodic reports previously filed with the Securities and Exchange Commission and transitioning to a new independent registered public accounting firm that will require additional time to audit the Company's 2015 financial statements and conduct a review of the Company's unaudited Q3 2016 financial statements. The specific date of the filing of the Q3 2016 Quarterly Report is not yet known, but the Company currently does not expect to file the Q3 2016 Quarterly Report

> within the extension period of five calendar days provided under Rule 12b-25 of the Securities Exchange Act of 1934, as amended.

299. On March 10, 2017, Defendants Law and Osiris announced in Osiris's Form 8-K and press release:

> the Company received a letter from the NASDAQ Stock Market ("NASDAQ") stating that trading of the Company's common stock will be suspended at the opening of business on Tuesday, March 14, 2017. The letter also states that NASDAQ will file a Form 25 with the SEC to formally delist the Company's securities from NASDAQ to become effective ten days after filing.
> The Company currently anticipates that its common stock will be quoted on the Pink OTC Markets Inc. system referred to as the "pink sheets." [….]
> The Company is working diligently to complete its previously announced restatement of prior period financial statements, transition to a new independent registered public accounting firm and conclude its 2015 and 2016 audits so that it will be in a position to bring its SEC filings up to date. [….]

300. On May 27, 2016, Osiris filed its Form 8-K announcing the United States Attorney's Office for the Southern District of New York opened a criminal investigation into what the Company understood to be historical accounting matters the SEC was investigating.

301. On November 2, 2017, the SEC filed a complaint against Osiris and the Individual Defendants. On November 3, 2017, the SEC announced that Osiris settled charges made by the SEC that Osiris Therapeutics routinely overstated company performance and issued fraudulent financial statements for a period of nearly two years. According to the SEC's complaint, the company improperly recognized revenue using artificially inflated prices, backdated documents to recognize revenue in earlier periods, and prematurely recognized revenue upon delivery of products to be held on consignment. Osiris Therapeutics and its executives also allegedly used pricing data that they knew was false and attempted to book revenue on a fictitious transaction, among other accounting improprieties.

302. The SEC complaint named Debrabandere, Jacoby, Law and Montgomery. Osiris

agreed to settle the charges for $1.5 million without admitting or denying the allegations, but the litigation against the Individual Defendants continues.

**F. Restatement of the Company's 2014 Results**

303. On March 27, 2017 Osiris issued its restated financial results on Form 10-K/A for the fiscal year ended December 31, 2017. The Company restated its 2014 annual financial statements and its quarterly financial statements for the quarters ended March 31, 2014, June 30, 2014, September 30, 2014, and December 31, 2014.

304. This filing reiterated the Audit Committee's conclusion that investors should not rely on the Company's financial reports covering particular reporting periods due to improper timing of revenue recognition under contracts with distributors. Namely, Osiris's unaudited interim and audited financial statements for all of 2014 and its unaudited interim financial statements for the 2015 reporting periods ending September 30, 2015 and for the quarters ended March 31, 2015 and June 30, 2015.

305. This filing also disclosed the Audit Committee determined that errors and irregularities in the Company's previous accounting in 2014 occurred on the basis of, among other things: (a) "with respect to sales transactions with two distributors that were affiliated with each other, the existence of extra-contractual or undocumented terms or arrangements initiated by former executives of the Company at the onset of the transactions and concessions agreed to by former executives of the Company subsequent to the initial transaction, such as unusually long payment terms. The existence of unusually long payment terms caused the related sales transactions to fail the 'fixed and determinable' criteria required under generally accepted accounting principles in the United States […] to recognize revenue[]"; and (b) "for one sales transaction to a third party distributor previously recorded in the fourth quarter of 2014, the existence of evidence indicating the former chief financial officer of the Company created a

document subsequent to filing of the Original Form 10-K. The evidence suggests that an arrangement with the distributor did not exist in 2014 so that the criteria required under GAAP to recognize revenue for this transaction in 2014 was not met."

306. The restatement revealed that the Audit Committee determined that certain requests for reimbursement submitted between 2012 and 2015 by Osiris's "Chairman of the Board to the Company's former chief financial officer should not have been paid to him."

307. This filing described the restatement as follows:

> *Recognition of revenue under distributor sales arrangements*. Based on the Independent Review, the Company determined that it had erred in its application of GAAP with respect to the recognition of revenue arising from certain distributor sales arrangements as described below:
>
> Certain distributor sales did not meet the criteria for recognizing revenue in 2014. During 2014, the Company provided unusually long payment terms to two distributors that were affiliated with each other. Granting a customer unusually long payment terms can cause the related sales transactions to fail the "fixed and determinable" criteria required under GAAP to recognize revenue. Also, for one sales transaction to a third distributor in the fourth quarter of 2014, the Company determined that evidence existed which suggests that an arrangement under GAAP did not exist in 2014. Accordingly, revenue arising from these transactions did not meet the criteria for recognizing revenue under GAAP in 2014. Correction of these errors decreased 2014 revenue by $10.3 million and decreased trade accounts receivable as of December 31, 2014 by a like amount. Net of product costs and sales commission expenses arising from these transactions, correction of these errors decreased 2014 net income by $5.6 million. Under GAAP, the $10.3 million revenue reversed in 2014 may be recognized in a future period on an accrual basis upon meeting the criteria for revenue recognition or, if such criteria is not met, on a cash basis, upon receipt of payment from the customer.
>
> Sales through government contracting agent. The Company utilizes a government contracting agent through which it sells to facilities of the United States Department of Veterans Affairs and the United States Department of Defense under the agent's GSA Federal Supply Schedule. The Company erred in reporting revenue from such sales net of the agent's fees, although GAAP (and the Company's policy) requires that revenue arising from contractual arrangements of this type be reported at the gross price paid by the end user, and that the related fees be reported as a sales expense. Correction of this error, with

respect to these sales, increased both 2014 sales and marketing expenses and product revenue by $1.5 million and, accordingly, had no impact on net income.

Taken together, correction of the errors arising from these two types of distributor sales arrangements decreased 2014 product revenue by $8.8 million (consisting of a $10.3 million decrease described in paragraph (1) above offset by a $1.5 million increase described in paragraph (2) above). In addition, the Company corrected other revenue accounting errors unrelated to distributor sales arrangements which decreased 2014 product revenue by an additional $241,000. As a result, the correction of errors in the Restatement decreased 2014 product revenue by a total of $9.0 million.

Consistent with corrections in the Company's recognition revenue, the product costs arising from the distributor sales transactions for which revenue has been reversed have also been reversed and added back to inventory. As a result of such corrections, inventory as of December 31, 2014 increased by $852,000 and the cost of product revenue for the year then ended decreased by the same amount. Similarly, sales commission expenses incurred during 2014 in connection with the distributor sales transactions for which revenue has been reversed have also been reversed. As a result of such corrections, prepaid expenses increased by $2.2 million, with respect to such expenses paid during 2014, and accrued expenses decreased by $1.5 million, with respect to commissions unpaid and accrued as of December 31, 2014, while 2014 sales and marketing expenses decreased by $3.8 million.

*Valuation of inventory and accounting for consigned inventory quantities*. Management determined that there were errors in the valuation of the Company's finished goods inventory resulting from computational errors, failure to update and apply current cost information in the calculation of unit costs, and non-timely identification and write-off of products that were no longer salable as determined by the Company's quality assurance procedures. In addition, management determined the need to establish a reserve for consigned finished goods inventory as the Company had not adequately monitored the ultimate disposition of consigned goods whereby some were returned, or scrapped, or used by the consignee. Lastly, management determined the need to establish a reserve for work-in-process inventory which largely consists of product in quarantine pending the outcome of the Company's quality assurance procedures. This process results in a reasonably consistent identification of product that is unsalable. Correction of these errors, to write-down the value of inventory as of December 31, 2014, increased 2014 cost of product revenue and decreased 2014 net income by $2.0 million.

*Bad debt reserve*. Management determined that it did not correctly assess the collectability of accounts receivable and determined an appropriate allowance for doubtful accounts as of December 31, 2014. Correction of this error, by increasing its 2014 bad debt expenses and allowance for doubtful accounts as of

December 31, 2014, increased the Company's 2014 general and administrative expenses by $450,000 and reduced its accounts receivables as of December 31, 2014 by the same amount.

*Classification of costs and expenses to income statement captions*. Management determined that errors had been made in classification of costs and expenses to income statement captions. Correction of these errors reduced 2014 cost of product revenue and research and development expenses by $4.1 million and $3.6 million, respectively, and increased sales and marketing and general and administrative expenses by $7.6 million and $134,000, respectively.

*Other adjustments*. In addition to the errors mentioned above, adjustments were made to the 2014 financial statements for various other errors identified by management and the Audit Committee during the course of the restatement process. The net impact of such adjustments was to decrease net income by $507,000 for the year ended December 31, 2014. See Note 2 (Restatement of the Financial Statements) to the Company's financial statements included in Part II, Item 8 of this Form 10-K/A for further details.

*Tax effect of Restatement adjustments*. The Company reduced 2014 income tax expense by $585,000 to account for the impact of the adjustments in the Restatement described above.

In the aggregate, the Restatement decreased revenue and net income for 2014 by $9.0 million and $8.2 million, respectively. The revenue decrease arises from a $10.3 million reversal of revenue resulting from the Company's failure to meet criteria for recognizing revenue under GAAP, offset by a $1.5 million increase in revenue required to recognize the gross end-user sales value of the product sold through the Company's government contracting agent. GAAP requires the recognition of revenue when the customer payment is received if unusually long payment terms are offered. Customer payments aggregating $8.1 million and $1.2 million were received in 2015 and 2016, respectively, on distributor sales transactions for which revenue was reversed in 2014, which will be recognized as revenue in the year payment was received. In addition, the Company corrected other revenue accounting errors unrelated to distributor sales arrangements which decreased 2014 product revenue by $241,000. See Note 2 (Restatement of the Financial Statements) to the Company's financial statements included in Part II, Item 8 of this Form 10-K/A for further details.

308. In connection with the 10-K/A and restatements, BDO audited Osiris's internal controls over financial reporting as they existed on December 31, 2014. BDO's audit was conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States) and based on criteria established in *Internal Control – Integrated Framework*

*(2013),* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). The resulting BDO report dated March 27, 2017 expressed an adverse opinion. BDO's report states, in part:

> In our report dated March 20, 2015, we expressed an unqualified opinion on the effectiveness of internal control over financial reporting as of December 31, 2014. Subsequent to March 20, 2015, Osiris Therapeutics, Inc. identified material misstatements in its annual and quarterly financial statements for 2014, requiring restatement of such financial statements. Management revised its assessment of internal control over financial reporting due to the identification of material weaknesses in connection with the financial restatement. Accordingly, our opinion on the effectiveness of Osiris Therapeutic, Inc.'s internal control over financial reporting as of December 31, 2014 expressed herein is different from that expressed in our previous report. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Material weaknesses have been identified and described in management's assessment. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2014 financial statements (as restated).
>
> In our opinion, Osiris Therapeutics, Inc. did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2014, based on the COSO criteria.
>
> We do not express an opinion or any other form of assurance on management's statements referring to any corrective actions taken by the company after the date of management's assessment.

309. The tables and other disclosures contained in Osiris's March 27, 2017 Form 10-K/A reflect material restatements of its income statements and balance sheets for each of its previously reported 2014 quarterly income statements.

310. For the quarter ended March 31, 2014, the 10-K/A reveals Defendants overstated revenues by $2.897 million, or over 40% of the proper amount ($7.157 million), and understated net losses by $957,000, or over 41% of the proper amount ($2.322 million). In addition, Defendants overstated trade accounts receivable by $3.136 million, or over 36% of the proper

amount ($8.627 million) and understated inventory by $912,000, or about 28% of the proper amount ($3.249 million).

311. For the quarter ended June 30, 2014, the 10-K/A Defendants overstated revenues by $4.084 million, or nearly 44% of the proper amount ($9.206 million), and understated net losses were understated by $3.368 million, or over 64% of the proper amount (-$5.253 million). In addition, Defendants overstated trade accounts receivable by $7.599 million, or over 81% of the proper amount ($9.291 million) and overstated inventory by $187,000, or almost 4% of the proper amount ($5.353 million).

312. For the quarter ended September 30, 2014, the 10-K/A reveals Defendants overstated revenues by $897,000, or over 5% of the proper amount ($16.307 million), and the Company suffered a $372,000 net loss instead of the previously reported $645,000 net profit. In addition, Defendants overstated trade accounts receivable by $8.934 million, or over 71% of the proper amount ($12.512 million) and overstated inventory by $973,000, or over 12% of the proper amount ($7.867 million). For the quarter ended December 31, 2014, the 10-K/A reveals Defendants overstated revenues by $1.154 million, or over 6% of the proper amount ($18.165 million) and the Company suffered a $2.203 million net loss instead of the previously reported $816,000 net profit.

313. In summary, the 10-K/A reveals Defendants overstated 2014 revenues by $9.032 million, or nearly 18% of the proper amount ($50.835 million), and understated 2014 net losses by $8.181 million, or nearly 82% of the proper amount (-$9.97 million). In addition, Defendants overstated trade accounts receivable by $10.934 million, or over 81% of the proper amount ($13.373 million) and overstated inventory by $1.1 million, or over 11% of the proper amount.

314. The magnitude of the above-discussed restatements (alone or in combination

with, for example, Osiris Audit Committee explanations in effect blaming Debrabandere, Jacoby, and/or Law, and BDO's adverse report on internal controls over financial reporting as of December 31, 2014) cannot be squared with Defendants' Sarbanes Oxley certifications during the affected reporting periods.

315. The full extent of Defendants' improper accounting remains unknown. The Company has not yet disclosed the results extent of its restatement for the quarterly financial periods ended March 31, 2015, June 30, 2015, and September 30, 2015 and has not filed its annual financial statements for the year ended December 31, 2015.

## VII. LOSS CAUSATION

316. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Lead Plaintiff and the Class. Defendants' unlawful conduct alleged herein directly and proximately cause the foreseeable losses suffered by Lead Plaintiff and the Class.

317. Throughout the Class Period, as set forth above, the market price of Osiris shares was inflated by the material omissions and false and misleading statements made by the Company and the Individual Defendants, which were widely disseminated to the securities markets, investment analysts, and the investing public. The false and misleading statements materially misrepresented to the market the Company's internal controls, financial results and prospects, and caused Osiris shares to trade in excess of their true value, including the following:

a. On May 12, 2014, Defendants touted within Osiris's Form 10-Q for the quarter ended March 31, 2014, Form 8-K and press release, and during earnings conference call with analysts, Osiris's substantial revenue growth, gross profit growth, gross margin improvement and healthy balance sheet, including high quality trade accounts receivables for the quarter ended March 31, 2014. These positive statements caused Osiris shares to climb from a closing price of $14.75 on May 12, 2014 to close at $16.37 on May 14, 2014 – a gain of about 11%.

b. On August 7, 2014, Defendants touted within Osiris's Form 8-K and press release

and during the earnings conference call with analysts Osiris's substantial revenue growth, gross profit growth and healthy balance sheet, including high quality trade accounts receivables, for the quarter ended June 30, 2014. These positive statements caused Osiris shares to climb from a closing price of $14.66 on August 7, 2014 to close at $14.84 on August 8, 2014 – a gain of about 1.2%.

c. On August 11, 2014, Defendants reiterated their August 7, 2014 positive statements within Osiris's Form 10-Q for the quarter ended June 30, 2014. This caused Osiris shares to climb from a closing price of $14.84 on August 8, 2014 to $15.43 on August 11, 2014 – a gain of about 4%.

d. On March 5, 2015 Defendants touted in Osiris's Form 8-K and press release, and during the earnings conference call with analysts, Osiris's substantial revenue growth, gross profit growth and healthy balance sheet, including high quality trade accounts receivables, for the quarter ended September 30, 2014. These positive statements caused Osiris shares to climb from a closing price of $16.94 on March 5, 2015 to close at $18.40 on March 6, 2015 – a gain of about 8.6%.

e. On March 20, 2015, Defendants reiterated the March 5, 2015 positive statements and made similar statements as to the full 2014 fiscal year within Osiris's Form 10-K for the year ended December 31, 2014. This caused Osiris shares to climb from a closing price of $17.59 on March 20, 2015 to close at $17.87 on March 21, 2015 – a gain of about 1.6%.

f. On May 8, 2015, Defendants touted in Osiris's Form 8-K and press release, and during the earnings analyst conference call, Osiris's substantial revenue growth, gross profit growth and healthy balance sheet, including high quality trade accounts receivables, for the quarter ended March 31, 2015. These positive statements caused Osiris shares to climb from a closing price of $15.39 on May 7, 2015 to close at $17.22 on May 11, 2015 – a gain of about 12%.

g. On May 11, 2015, Defendants reiterated the May 8, 2015 positive statements in Osiris's Form 10-Q for the quarter ended March 31, 2015. This caused Osiris shares to climb from a closing price of $17.22 on May 11, 2015 to close at $17.52 on May 12, 2015 – a gain of about 1.7%.

318. As a result, Lead Plaintiff purchased Osiris shares at artificially inflated prices. When the partial truth about Osiris's financial results and prospects was revealed to the market through several partial disclosures, the price of Osiris shares declined in response, as the artificial inflation caused by Defendants' misrepresentations and omissions was partially removed from the price of Osiris shares, thereby causing substantial damages to the Lead Plaintiff and the Class, including the following partial disclosures:

a. On November 6, 2015, Defendants filed Osiris's Form 8-K and press release and

held an earnings conference call with analysts, partially disclosing certain improper revenue recognition related to sales to a distributor that should have been on a cash basis. This caused Osiris shares to fall from a closing price of $18.25 on November 5, 2015 to close at $14.54 on November 6, 2015 – a loss of about 20%.

b. On November 16, 2015, Defendants filed Osiris's Form 10-Q for the quarter ended September 30, 2015, partially disclosing certain improper revenue recognition in the fourth quarter of 2014 and in the first and second quarters of 2015 pertaining to sales to distributors that should have been on a cash basis. Defendants also stated that there were material weaknesses in Osiris's internal controls over financial reporting as of December 31, 2014, March 31, 2015, and June 30, 2015 but that the weaknesses did not result in a material misstatement of Osiris financial statements for the year ended December 31, 2014. This caused Osiris shares to fall from a closing price of $13.98 on November 16, 2015 to close at $10.97 on November 17, 2015 – a loss of about 21.5%.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

319. At all relevant times, the market for Osiris common stock was an efficient market for the following reasons, among others:

a. Osiris common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. as a regulated issuer, Osiris filed periodic public reports with the SEC and the NASDAQ;

c. Osiris regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Osiris was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

320. As a result of the foregoing, the market for Osiris common stock promptly digested current information regarding Osiris from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Osiris stock during the Class Period suffered similar injury through their purchase of Osiris common

stock at artificially inflated prices and/or their purchase of Osiris call options or sale of Osiris put options at prices tied to the artificially inflated price of Osiris's common stock and a presumption of reliance applies.

## IX. NO SAFE HARBOR

321. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Osiris who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 <u>Promulgated Thereunder Against All Defendants</u>

322. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

323. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

324. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

325. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Osiris stock. Lead Plaintiff and the Class would not have purchased Osiris stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

326. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Osiris stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of <br>the Exchange Act Against the Individual Defendants

327. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

328. Osiris, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

329. The Individual Defendants acted as controlling persons of Osiris within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Osiris, and their ownership of Osiris stock, the Individual Defendants exercised control over the management, general operations and polices of Osiris, as well as the specific activities upon which Osiris's violations are based, and had the power and authority to cause Osiris to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

330. Debrabandere, as CEO of Osiris, had significant control over Osiris during the time period relevant to this Complaint. Debrabandere exercised control over Osiris's management and general operations, set and communicated Osiris's financial targets, and signed and/or certified Osiris's SEC filings. Moreover, as detailed above, he exercised control over much of the specific, violative activity that is the subject of this Complaint, including transactions with Distributor B, C, and D, and had a substantial role in that conduct.

331. By reason of the foregoing, each of the Individual Defendants are liable as a control person under Section 20(a) of the Exchange Act for Osiris's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## X. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, and certifying Lead Plaintiff as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## XI. JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: April 6, 2018

HIRSCHLER FLEISCHER

By *\/s\/ Wayne G. Travell*

Wayne G. Travell (Bar No. 09182)
Robert R. Vieth (Bar No. 22926)
8270 Greensboro Drive, Suite 700
Tysons, VA 22102
Telephone: (703) 584-8903
Facsimile: (703) 584-8901
Email: wtravell@hf-law.com
Email: rvieth@hf-law.com

*Liaison Counsel for the Class*

Steve W. Berman *(Pro Hac Vice)*
Karl P. Barth *(Pro Hac Vice)*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918Eighth Avenue, Suite 3300
Seattle, WA98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
karlb@hbsslaw.com

Reed R. Kathrein *(Pro Hac Vice)*
Peter E. Borkon *(Pro Hac Vice)*
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

*Lead Counsel for Lead Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2018, I caused the foregoing Amended Complaint to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all counsel of record. I also certify that, on the same date, I caused the foregoing Amended Complaint to be served by first-class mail, postage pre-paid on *pro se* defendant Philip R. Jacoby, Jr., at the following address: 19506 Inverness Drive, Spicewood, Texas 78669-6521.

*/s/ Wayne G. Travell*

Wayne G. Travell (Bar No. 09182)
8270 Greensboro Drive, Suite 700
Tysons, VA 22102
Telephone: (703) 584-8903
Facsimile: (703) 584-8901
Email: wtravell@hf-law.com

*Liaison Counsel for the Class*